Vernon A. MERCIER, et al., Plaintiffs,

v.

INTER–TEL (DELAWARE), INCOR-
PORATED, Norman Stout, Alexander
Cappello, J. Robert Anderson, Jerry
W. Chapman, Gary D. Edens, Steven
E. Karol, Robert Rodin and Agnieszka
Winkler, Defendants.

C.A. No. 2226–VCS.

Court of Chancery of Delaware,
New Castle County.

Submitted: Aug. 8, 2007.

Decided: Aug. 14, 2007.

Michael Hanrahan, Esquire, Paul A. Fioravanti, Jr., Esquire, Tanya Pino Jefferis, Esquire, Laina M. Herbert, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Plaintiffs.

Marc A. Topaz, Esquire, Lee D. Rudy, Esquire, Michael Wagner, Esquire, James H. Miller, Esquire, Schiffrin, Barroway, Topaz & Kessler, LLP, Radnor, Pennsylvania, Of Counsel for Plaintiffs.

A. Gilchrist Sparks, III, Esquire, S. Mark Hurd, Esquire, Jay N. Moffitt, Esquire, Kevin M. Coen, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Individual Defendants.

Stephen C. Norman, Esquire, John F. Grossbauer, Esquire, Kevin R. Shannon, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendant Inter–Tel (Delaware), Incorporated.

Stephen D. Alexander, Esquire, J. Warren Rissier, Esquire, Jennifer Sepic, Esquire, bingham McCutchen LLP, Los Angeles, California, Of Counsel for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I.

In this decision based on a preliminary injunction record, I conclude that well-motivated, independent directors may reschedule an imminent special meeting at which the stockholders are to consider an all cash, all shares offer from a third-party acquiror when the directors: (1) believe that the merger is in the best interests of the stockholders; (2) know that if the meeting proceeds the stockholders will vote down the merger; (3) reasonably fear that in the wake of the merger's rejection, the acquiror will walk away from the deal and the corporation's stock price will plummet; (4) want more time to communicate with and provide information to the stockholders before the stockholders vote on the merger and risk the irrevocable loss of the pending offer; and (5) reschedule the meeting within a reasonable time period and do not preclude or coerce the stock-

holders from freely deciding to reject the merger.

In the course of so deciding, I conclude that, consistent with the directional teaching of cases like *MM Companies, Inc. v. Liquid Audio, Inc.*,[1] *In re MONY Group, Inc. S'holder Litig.*,[2] and *Chesapeake Corp. v. Shore*,[3] the *Blasius* standard should be reformulated in a manner consistent with using it as a genuine standard of review that is useful for the determination of cases, rather than as an after-the-fact label placed on a result. Such a reformulation would be consistent with prior decisions recognizing the substantial overlap between and redundancy of the *Blasius* and *Unocal* standards,[4] and would have the added benefit of creating a less prolix list of standards of review. Recognizing, however, that the Supreme Court's recent decision in *Liquid Audio* continued to employ the "compelling justification" language of *Blasius* within the context of an appropriate *Unocal* review of director conduct that affects a corporate election touching on corporate control, I also find that directors fearing that stockholders are about to make an unwise decision that poses the threat that the stockholders will irrevocably lose a unique opportunity to receive a premium for their shares have a compelling justification—the protection of their stockholders' financial best interests—for a short postponement in the merger voting process to allow more time for deliberation.

Therefore, the plaintiff's request for a preliminary injunction application based on the contrary assumption—that directors have no discretion as fiduciaries to reschedule a vote once a stockholder meeting is imminent and the directors know that the vote won't go their way if it is held as originally scheduled—is denied.

## II.

### A.

The plaintiff, Vernon Mercier, in this class action seeks to preliminarily enjoin the consummation of a stockholder approved merger in which Inter–Tel, Inc. will sell itself to Mitel Networks Corporation in an all cash, all shares merger for $25.60 a share (the "Mitel Merger"). Mercier owns 100 shares of Inter–Tel, which he has held since 1999.[5]

Inter–Tel describes itself as a:

single-point-of-contact, full-service provider of IP and converged voice, video and data business communications platforms, multi-media contact center applications, remote control software to provide real-time communications and instantaneous, browser-to-browser Web conferencing and help desk support solutions. Inter–Tel also provides a wide range of managed services, including voice and data network design and traffic provisioning, local and long distance calling services, custom application development, maintenance, leasing, and support services for its products.[6]

As I grasp it, this essentially means that Inter–Tel sells high-tech phone systems

---

1. 813 A.2d 1118 (Del.2003).

2. 853 A.2d 661 (Del.Ch.2004).

3. 771 A.2d 293 (Del.Ch.2000).

4. *E.g., Liquid Audio*, 813 A.2d at 1129; *Stroud v. Grace*, 606 A.2d 75, 92 (Del.1992); Chesapeake, 771 A.2d at 317–324.

5. Mercier has been litigating against the Inter–Tel board for several years now, pressing claims that arise out of actions taken by the board during a lengthy period of internal strife. I have neither the time nor the need to describe the prior claims Mercier has made.

6. PX 6 at 15.

and provides communications services to businesses and government agencies. Inter–Tel was founded over thirty-five years ago by Steven G. Mihaylo. Mihaylo remains Inter–Tel's largest stockholder, owning 19% of its shares. Although the plaintiff's arguments often echo those made by Mihaylo, Mihaylo himself is not a plaintiff in this or any other lawsuit involving Inter–Tel. Mihaylo has not been deposed in the case and has not submitted affidavit testimony.

For the past several years, Inter–Tel has been the subject of a tumultuous struggle between Mihaylo and Inter–Tel's independent board majority. The parties have not burdened the court in their injunction papers with an explanation of why and how the waters first became roiled.

What is clear is that since 2005, Inter–Tel's future has been up for grabs. During 2005 itself, Inter–Tel received several soft overtures from potential buyers. These included Mitel, one of Inter–Tel's leading competitors, which could expect to capture synergistic gains if it merged with Inter–Tel. The Mitel contact was not new, as Inter–Tel and Mitel had discussed the possibility of merging two years before.

Among the other parties that contacted Inter–Tel during 2005 was the private equity firm Francisco Partners. In autumn 2005, a special committee of independent directors was formed to consider the various expressions of interest Inter–Tel had received. Eventually, things got serious with one bidder. But, at the same time, the Inter–Tel board was internally riven, with a majority of the board wanting Mihaylo, who had served as Inter–Tel's CEO since its founding, to retire from that position. Eventually, both the interested bidder and Mihaylo went away, but only one did so permanently.

In February 2006, Mihaylo resigned as CEO. In early March, he resigned as a director. By that time, the interested bidder had ultimately decided not to make a firm offer. Whether the obvious strife between the corporation's founder and the board majority had an effect, the record does not reveal.

But what transpired is suggestive of that possibility. Upon resigning as director, Mihaylo filed a Schedule 13D indicating that he was considering his alternatives regarding his investment in Inter–Tel. Because of that, the Inter–Tel Special Committee remained active, given the possibility that Mihaylo himself might propose a strategic alternative. On the heels of Mihaylo's filing, another party made an expression of interest.

Mihaylo soon sought re-election to the Inter–Tel board, indicating his intent to elect a slate of three directors, including himself, to Inter–Tel's board, at the 2006 annual meeting.[7] He also proposed a non-binding resolution calling on the board to sell Inter–Tel to the highest bidder.

In May 2006, the Inter–Tel board reached a settlement with Mihaylo. Mihaylo's proposed slate was seated on the board, and the board was expanded from 10 to 11 members. Mihaylo was also guaranteed the right to have his advisors and financial sponsors obtain access to reasonable due diligence in order to facilitate his ability to make an acquisition proposal. Furthermore, the settlement agreement provided that Inter–Tel would convene a special meeting at Mihaylo's request if he wished to have a stockholder vote on a

---

**7.** Mihaylo's 19% bloc gave him a strong starting point, especially given Inter–Tel's embrace of cumulative voting.

proposal calling for the board to sell the company.

Importantly, the agreement permitted the board to exclude Mihaylo and his nominees, Kenneth L. Urish and Anil K. Puri,

from any discussions, and from receipt of any materials regarding, Inter–Tel's value and the strategic plan upon which such value would in part be based, Inter–Tel's relationship with Mr. Mihaylo, and the consideration of any proposal to acquire Inter–Tel from Mr. Mihaylo or any other person, in each case until Mr. Mihaylo filed a Schedule 13D disclosing that he no longer had an intent to increase his shareholdings or otherwise acquire Inter–Tel.[8]

Consistent with that agreement, the board constituted a new "Special Committee," which was comprised of the other eight directors. The Special Committee's Chairman was Alexander Cappello, who was also the Chairman of the Board. The executive who succeeded Mihaylo as CEO, Norman Stout, also served on the Special Committee. The remaining six members of the Special Committee were and remain non-employee, outside directors whose independence has not been challenged by the plaintiff. The Special Committee retained UBS, which had been advising the board majority before the settlement, as its financial advisor.

Throughout the late spring and summer of 2006, the Special Committee fielded acquisition inquiries from a variety of sources. Most notable was a formal expression of interest that Mihaylo, along with a partner, Vector Capital, made on June 14, proposing to buy all of Inter–Tel's shares for $22.50 a piece. After more due diligence, Mihaylo and Vector reiterated this bid on July 28. On August 11, the Special Committee rejected the bid as inadequate.

Mihaylo and Vector then offered to raise their bid to $23.25 per share if the Special Committee committed to selling Inter–Tel to the highest bidder who emerged during a 30–day sale process. The Special Committee again rejected the bid as inadequate financially, and also opined that the 30 day process was not value-maximizing because other bidders would be disadvantaged by Mihaylo's much greater opportunity for due diligence.

Soon thereafter, Mitel came sniffing around again, as did some other parties. But no firm bids were made.

Mihaylo, however, did put something on the table—a precatory resolution calling on the Inter–Tel board to sell the company in an auction. At a special meeting of stockholders held on October 24, 2006, over 50% of the Inter–Tel stockholders present voted against the resolution. After this defeat, Mihaylo and Vector withdrew their proposal to acquire Inter–Tel while reserving the right to change their minds.

This showdown did little to calm the roiled waters. Interested parties kept coming forward and the Special Committee essentially continued to operate. By late 2006, both Mitel and Francisco Partners were again expressing interest. By January 2007, the two had paired up, with Francisco Partners being prepared to act as a financial partner for Mitel in acquiring Inter–Tel.

Mihaylo, meanwhile, was threatening another proxy contest. In a public communication to the board, Mihaylo outlined his own ideas for increasing Inter–Tel's profits and his suggestions for avoiding another electoral contest. According to the Inter–Tel board majority, Mihaylo's non-public

8. PX 6 at 18.

strategy involved his desire to have Inter–Tel buy his shares at a premium to the prevailing market price. By early March, Mihaylo formally indicated his intention to run another proxy contest, and announced that he had terminated his alliance with Vector Capital.

In the same general time period, Mitel and Francisco Partners had indicated a willingness to purchase Inter–Tel for $25 per share, subject to their receipt of due diligence. The Special Committee decided that the price was attractive enough to justify granting such access, and a confidentiality agreement was executed with Mitel authorizing such due diligence.

Throughout March and April, extensive due diligence and negotiations were conducted between Mitel and Inter–Tel. The Special Committee told Mitel that $25 per share was insufficient. Mitel eventually countered with $25.50. The Special Committee rejected that price and Mitel threw in another dime per share, raising the bid to $25.60.

In the final stages of deciding whether to accept Mitel's last bid, the Special Committee received a letter from Vector Capital indicating that Vector had heard rumors [9] that Inter–Tel was about to enter a deal. Vector Capital suggested it would pay $26.50 per share after due diligence and that Mihaylo was not part of its proposal. Of course, Vector Capital had received extensive due diligence regarding Inter–Tel in the summer of 2006 when it was in partnership with Mihaylo. On the morning of April 26, the day the Special Committee and full board were to vote on whether to enter a merger agreement with Mitel, Vector Capital sent e-mail messages, floating the tantalizing prospect of a bid of over $27 if it could receive due diligence and indicating its likely unwill-

ingness to present a topping bid if a merger agreement with another party was signed up.

Considering a variety of factors—including Mihaylo's prior bid of $23.25, the lengthy period during which various parties had expressed an interest in buying Inter–Tel, and a fairness presentation from its financial advisor, UBS—the Special Committee voted to recommend approval of a "Merger Agreement" with Mitel. A full meeting of the Inter–Tel board was held, and the board voted the same way, with Mihaylo dissenting, and his two nominees Puri and Urish abstaining. The same day, Inter–Tel announced approval of the Mitel Merger Agreement as well as its earnings for the first quarter of FY 2007.

The Merger Agreement contained a no-shop provision that was subject to a fiduciary out permitting the Inter–Tel board to consider an unsolicited alternative proposal that was reasonably likely to lead to a superior proposal. The fiduciary out soon came in handy.

On May 9, Vector Capital sent an unsolicited letter to Inter–Tel expressing interest in purchasing it for $26.50. The Special Committee promptly made the required determination necessary to facilitate Vector Capital's access to due diligence. But Vector Capital then withdrew its expression of interest.

Ever fickle, Vector Capital then sent another letter renewing its interest at the price of $26.50 per share. The Special Committee again made the required finding, and entered into a confidentiality order granting Vector Capital access to non-public information. Vector Capital's interest was made public, prompting the market price of Inter–Tel's shares to rise

9. From whom? Inquiring minds want to know.

above $27 a piece on hopes of a higher-priced deal.

On May 29, 2007, Inter–Tel gave notice that a meeting to consider the Mitel Merger would be held on June 29. May 25 was set as the record date.

Inter–Tel's proxy materials also indicated that the stockholders would vote on a second ballot item, which involved a "proposal to adjourn or postpone the special meeting, if necessary or appropriate, to solicit additional proxies if there are not sufficient votes in favor of the adoption of the Merger Agreement at the special meeting...." [10] Apparently, the second ballot item was included as a result of a general practice of the SEC that encourages issuers to seek stockholder pre-approval for an adjournment. [11]

After Inter–Tel set the meeting date, Mihaylo entered the game again, this time proposing an alternative to his former partner Vector Capital's expression of interest. On June 4, Mihaylo sent a public letter to the Inter–Tel stockholders. In that letter, Mihaylo complained that the Special Committee had been secretly considering acquisition proposals and had not asked him to bid or conducted a full auction. He expressed his opposition to the Mitel Merger and proposed an alternative transaction whereby Inter–Tel would engage in a leveraged recapitalization. The Mihaylo "Recap Proposal" involved the company using a 50–50% combination of cash on hand and new debt to acquire up to 60% of its shares for $28 a piece. Mihaylo contended that the remaining shares would trade close to $30 a piece based on the corporation's expected earnings. Mi-

haylo premised his assumptions on a use of Inter–Tel's own projections (which had not been prepared for use in concert with a leveraged recapitalization), while simultaneously disclaiming their reliability. Mihaylo also claimed that he remained open to a sale of Inter–Tel, so long as the sale resulted from a process Mihaylo found acceptable.

Mihaylo concluded by promising that he would be filing more details about his Recap Proposal with the SEC and sending stockholders a proxy card that they could use to vote no on the Mitel Merger.

The very next day, Vector Capital announced that it would not make an offer for Inter–Tel after all, attributing its reticence in part to Mihaylo's Recap Proposal. From then on, it was game on between Inter–Tel's board majority and Mihaylo.

### B.

In June, Inter–Tel and Mihaylo tangled about what vision of Inter–Tel's future was the most attractive. On June 8, Mihaylo disclosed his intention to seek control of the board at the next annual meeting if the Mitel Merger were defeated. [12] Inter–Tel made counterarguments, touting the certainty of the value the Mitel Merger promised to deliver over what Inter–Tel believed would flow from Mihaylo's Recap Proposal, a proposal that Inter–Tel argued was imprudent, excessively contingent, and less valuable.

Inter–Tel took its argument to regulators, stockholders, and its proxy voting advisors. To the SEC, Inter–Tel argued that Mihaylo had misused Inter–Tel's pro-

---

**10.** PX 6 at 6.

**11.** *See* Transcript, *Roundtable Discussions Regarding the Federal Proxy Rules and State Corporation Law* at 239 (May 7, 2007), *available at* http://www.sec.gov/spotlight/proxyprocess/proxy-transcript050707.pdf (discussing the

fact that the SEC has some "unwritten policies" regarding shareholder voting on adjournments of meetings).

**12.** PX 10.

jections in presenting his Recap Proposal by, among other things, failing to adjust those projections for the changes in the business that would flow from the Recap Proposal itself and for failing to acknowledge that the company's projections were not guarantees and might not be achieved. To its stockholders, Inter–Tel made similar arguments. It coupled them with reminders of Mihaylo's own offer to buy the company for only $23.25 per share several months back, an offer that Mihaylo had supported with the argument that Inter–Tel's stock price would drop markedly if his $23.25 offer went away. Given that argument, Inter–Tel said Mihaylo was in no credible position to argue either $25.60 per share was too low or that Inter–Tel's remaining shares would likely trade above $30 after the first step of Mihaylo's Recap Proposal was consummated.

But Inter–Tel suffered body blows in mid-June. Mihaylo's argument that his Recap Proposal promised a blended value above $29 was gaining some traction, in two respects. For starters, there was the possibility that the Recap Proposal might be more valuable. But equally important seems to have been the pressure institutional investors believed it put on Mitel to make a higher bid, especially given that the Recap Proposal was sponsored by Inter–Tel's largest stockholder.

On June 13, Millennium Management L.L.C.—which the plaintiff touted as a significant institutional stockholder in originally moving to press an injunction motion against closing of the Merger—announced that it was seriously considering opposing the Mitel Merger. It cited in part the possibility that the Recap Proposal promised more value.

Then, on June 19, Inter–Tel suffered a crippling injury when Institutional Shareholder Services recommended that stockholders vote against the Mitel Merger.[13] ISS based its recommendation in part on its dissatisfaction with Inter–Tel's failure to run a full-blown auction in advance of signing up with Mitel, a philosophical stance toward the appropriate method of value maximization that ISS seeks to advance through voting recommendations. More important, however, seemed to be ISS's intuition that more value could be extracted from Mitel if Mitel felt the pressure of a "no" recommendation. In other situations, including one very recent one, an ISS no vote recommendation had caused an offeror to come out of pocket with a higher bid. Although it disclaims wielding power, ISS was believed by Inter–Tel, and its highly experienced proxy solicitors, Innisfree M & A Incorporated, to be very influential as to its clients' voting decisions. By recommending a "no" vote on June 19, ISS could aid its clients in their goal of value maximization by exerting pressure on Mitel to up its offer. That motivation was supported by ISS's sense that the Mitel offer was not at an optimal price. In reaching that determination, ISS took into account Inter–Tel management's statements that the company's projections might be overly optimistic.

As it should have been, the Inter–Tel Special Committee had been using the uncertainty of approval and Mihaylo's opposition to the Merger as a lever to try to get Mitel to increase the Merger consideration. But, on June 21, Mitel pushed back, trying to make clear to Inter–Tel's stockholders that negotiations had closed and that they could take $25.60 or retain their shares. Mitel stressed that Inter–Tel's

---

**13.** The plaintiff also trumpeted the importance of ISS's recommendation in originally opposing rescheduling of the special meeting.

first quarter performance was below par, that Inter–Tel's two years of internal strife were taking their toll, that its offer was far higher than any other party, including Mihaylo, had actually bid to buy the whole company, and that Mitel was already taking on material risks in buying Inter–Tel at the existing price. A press release making this announcement was released on June 22.

By this point, Inter–Tel knew that its prospects for getting an affirmative vote on the Merger at the June 29 meeting were slim, absent some change in circumstances. As the plaintiff points out, serious conversations also began among key Special Committee advisors and top management about the possibility of postponing the June 29 meeting to allow more time for Inter–Tel to make its case.

But Inter–Tel also continued to press its case, pursuing an angle that it realized could be particularly influential—Mihaylo's opposition to the Mitel Merger and the possibility of getting Mitel to sweeten the deal if Mihaylo signed on. If Mitel could be assured of Mihaylo's support, and an end to his status as a potentially very large appraisal petitioner, that would have real economic value in the sense that it would generate both an increased certainty of closing and eliminate a future risk. An effort was made to bring Mitel and Mihaylo together around a revised Merger Agreement providing for an increase in the Merger consideration to $26 per share and a reduced break-up fee, among other things. Care was apparently taken to ensure that Mihaylo was approached in the most diplomatic and respectful manner,

and Mitel itself reached out to him. But Mihaylo was not amenable, and raised a number of issues (such as concerns about the future of certain employees and of a company campus near his home) that reflected his unique (and understandable) perspective as a founder, rather than a focus on maximizing value for stockholders.[14]

Without Mihaylo's support, Inter–Tel lacked any real sweetener to offer Mitel. One important factor in that dynamic was the reality that Mitel was not financing its offer with internal resources. As noted, it had a financial partner, Francisco Partners, that was a private equity firm. Although Mitel as a strategic acquirer faced the usual temptations to stretch in order to make an acquisition of a competitor, Francisco had different interests. Repricing the deal would require Mitel to deal with Francisco at a time when it was becoming clear that the favorable debt financing markets that had been supporting a wave of private equity deals were heading south. From Francisco's perspective, the prospect that the Inter–Tel transaction might go away may not have been sleep-disturbing. Although it doubtless had reputational reasons not to pull out on Mitel, Francisco was under no obligation to agree to different terms simply because its strategic partner was tempted to move higher, especially if such a move did not obviate Mihaylo's objection.

As of at least five days before June 29, the Special Committee began seriously considering the possibility of a postponement of the vote. By that time, they

---

**14.** It is not clear that before June 29 the Special Committee knew all of Mihaylo's reasons for rejecting Mitel's overture or the precise overture it made. It did know Mihaylo was unmoved. At a June 30 board meeting, Mihaylo told the board that he rejected a $26 offer largely because of these concerns unre-

lated to stockholder value. *See* PX 93 ("Mr. Mihaylo said he was not willing to [support a $26 bid] without knowing further details, including what would happen with Inter–Tel product lines, which employees would be terminated, and other post-transaction operational and strategic matters.").

realized that the Merger would almost certainly go down to defeat absent a change in the deal. By June 28, it was clear that no such change would happen.

## C.

Within the last week leading up the scheduled June 29 special meeting, a list of factors began to emerge that the Special Committee and its advisors had identified as potentially justifying rescheduling the special meeting. In putting it that way, I do not mean to imply that these factors were makeweight excuses for a postponement. But I do find, as the plaintiff urges, that the Special Committee and its advisors had a keen eye out for circumstances that might, when taken together, plausibly justify a delay in the vote. Unlike the plaintiff, however, I find nothing in the record that suggests that the Special Committee had an improper motivation to delay the vote. None of the Special Committee members, including Stout, had been promised any position with Mitel after the Merger, and each expected to lose his board seat upon approval. Put simply, the Special Committee, on this record, must be viewed as supporting the Merger because they thought it was in the best interests of the Inter–Tel stockholders.

In support of that conclusion is the uncontradicted record that the Special Committee had been open to overtures from a variety of bidders, including ones whose previous overtures (such as Vector Capital and Mihaylo) generated reason for suspicion. Given the lack of any prospect of a higher-priced deal, the Special Committee feared that an attractive takeover bid could be lost if the stockholders voted no and gave Mitel and Francisco a contractual right to depart.

As the proxy fight continued in the last week, Inter–Tel began to assemble a case for postponement. The factors that went into that case were several.

For starters, Inter–Tel's proxy solicitor, Alan Miller, and its CEO, Stout, had heard from several Inter–Tel stockholders that they favored a postponement. Some of these stockholders now owned more shares than they had at the May 25 record date, and could not vote those newly-bought shares on June 29. Some stockholders had positions that consisted entirely of shares bought after the record date. As the plaintiff notes, many of these investors were arbitrageurs and hedge funds. Miller detected sentiment in support of the Merger from many of them and a desire on their part for the vote to be had when they could participate. Because the Vector Capital overture had sent Inter–Tel's stock price above $27, and because the price had subsequently dropped to the $24 range, Miller also believed that arbitrageurs would continue to buy shares if the meeting was postponed and a new, later record date was set. Because they could buy at a price below what Mitel was offering, they would have an incentive to see the Merger approved and lock in a gain.

But, in contrast to the plaintiff, I find that Inter–Tel also picked up on another kind of sentiment. The ISS "no" recommendation had started a high-stakes game of chicken. Mitel had not blinked. As June 29 approached, some Inter–Tel stockholders who were disinclined to favor the Merger when they believed a higher bid could be achieved began to get nervous. Millennium, one of Inter–Tel's largest institutional stockholders, for example, was interested in a delay. ISS also indicated that its recommendation could change, but only if the vote were postponed and there was public information suggesting that the company's financial circumstances had worsened in a manner that warranted reconsideration of its previous determina-

tion. If a vote actually went forward on June 29 and the Inter–Tel stockholders acted on ISS's recommendation, there was a growing sense that Mitel might just walk away, leaving Inter–Tel's stockholders to enjoy the future benefits of their pro-rata share of the corporation's value as a going concern.

Of course, the Mihaylo Recap Proposal was also in the air, in a way that the Special Committee believed had caused confusion. The Special Committee continued to believe that the Recap Proposal was not a sound or firmly financed one and that Mihaylo had premised it on an untenable use of the corporation's projections. As the vote loomed, the Special Committee began to focus on the fact that Inter–Tel's second quarter results would be available in early July, as the quarter would close on June 30. As things were trending, Inter–Tel's internal tracking reports indicated that the company was likely to fall short of its expected earnings for the quarter, a second consecutive miss. Based on the same trends, Inter–Tel management believed it was also unlikely that Inter–Tel would achieve the projections in the remaining two quarters of FY 2007. Once that information became public, the Special Committee and its advisors thought it might be influential to ISS and stockholders, because it would suggest that there was no compelling reason for Mitel to increase its bid and that Mihaylo's argument that he could use the company's funds to buy up 60% of the shares at $28 and cause the remaining shares to trade at $30 was fallacious.

Similarly, on June 28, the Wall Street Journal published three articles prominently raising concerns whether the M & A market was going to lose its froth, due to tightening in the credit markets. Although the plaintiff lampoons this development, the record does indicate that the June 29 vote coincided with the period when players in the financial markets began to have a real appreciation—due to the termination and repricing of some big deals—that the favorable tide was reversing. The Special Committee and its advisors thought this factor, when taken together with Mitel's failure to raise its bid and Inter–Tel's performance, might be given weight by ISS and investors if they had additional time.

Two related considerations also came into play. It was not until June 27, two days before the scheduled meeting, that Mihaylo's proxy materials were finalized. His final materials included some changes required by the SEC, including forcing him to caveat his prediction that Inter–Tel's shares would trade at $30 after a $28 buyback. Thus, the Special Committee viewed it as appropriate to premise a delay in part on the need to allow the stockholders to consider its proxy rival's final materials before making a final voting decision.

Less substantively, the Special Committee and its advisors picked up on some minor confusion caused by Mihaylo's late-approved materials. Once Mihaylo's materials became final, that had the effect of making the Mitel Merger vote a "contested election" in the system operated by Broadview—formerly ADP—a crucial component in the voting system for corporate America. This changeover, so close to a scheduled vote, was highly unusual and created some confusion. Inter–Tel had heard that at least one large stockholder had difficulty giving a proxy as a result. In Mihaylo's own materials, he had adverted to a possibility of a delay in the special meeting. This, along with the changeover and the widespread chatter among investors and the contending proxy solicitors, apparently caused ISS and some others to believe the meeting was being rescheduled.

## D.

As June 29 approached, the Special Committee knew with virtual certainty that the Merger would be defeated if the special meeting was held as scheduled. By June 25, Innisfree was already reporting that every large holder who had voted had opposed the Merger. On June 26, ISS's West Coast rival Glass Lewis also recommended a no vote on the Merger.

The next day Innisfree reported that over 73% of the shares had been voted, and that 49.6% of Inter–Tel's outstanding shares were already voted against the Merger. The vote was running even heavier against authorizing an adjournment in the event there were not enough votes to approve the Merger.

By this stage, the Special Committee was fatalistic. Stout viewed the Merger as "DOA," but he and others on the Special Committee team continued to try to make the vote closer, in part because, as its Chairman Cappello noted, a close vote would "help later when [Mihaylo] goes to dump the board."[15] It was at this stage that Innisfree received indications from ISS that it might reconsider its position if there was a postponement.[16] Innisfree also advised Stout and Cappello that "a short move in the record date would get the arbs fairly heavy in the stock."[17]

In the afternoon of June 28, Stout called a Special Committee for that evening to discuss whether to postpone the special meeting. That day Stout also sought Mitel and Francisco Partners' support for a postponement. Francisco Partners did not warm to the idea at all. Mitel's CEO appears to have supported the move, being hungry for the deal, but did not give any formal consent.

At a lengthy meeting, the Special Committee deliberated on whether to postpone the meeting. The meeting was clearly and thoroughly "advised," shall we say, and the meeting minutes do not reflect the obvious reality driving the need for the meeting: the Merger was going down to defeat the next day. Instead, the minutes concentrate on the various factors outlined above that supposedly justified a postponement.[18] The Special Committee ultimately decided to sleep on it. They reconvened early the next morning and decided to reschedule the meeting. One member of the Special Committee dissented. He favored the Merger but was uncomfortable rescheduling the vote.

The Special Committee believed that the special meeting should be rescheduled so that the stockholders would have the benefit of the company's second quarter results and more time to deliberate on the other factors outlined before rejecting the Merger. The Special Committee thought it was in the stockholders' best interests for them to think about it more. Although the minutes do not put it this way, the Special Committee believed the stockholders were about to make a huge mistake.

In voting to reschedule, the Special Committee was aware that if the vote were held that day, the Merger would be soundly defeated. In fact, as of that time, it was clear that an absolute majority of the outstanding shares, almost 15.5 million shares, were going to vote against the Merger, and that only around 5 million shares favored the Merger.[19]

---

15. PX 61.

16. PX 70.

17. *Id.*

18. *See* PX 74 (minutes of June 28 Special Committee meeting).

19. PX 69.

The Special Committee delayed the vote precisely so that it could have more time to convince the stockholders to support the Merger. In fact, Stout, the company's CEO, has admitted that he would not have favored postponing the meeting if the stockholders were poised to approve the Merger.[20]

The Special Committee announced the rescheduling via a press release, indicating that the "new date, time and location for the meeting will be announced early next week."[21] The press release contained these lengthy statements from its Chairman Cappello:

> After careful consideration, the Special Committee has decided to postpone the vote on the Mitel merger so that all Inter–Tel stockholders can evaluate recent developments when deciding how to vote their shares. We believe stockholders should have the opportunity to consider the significant recent changes in the debt capital markets adversely affecting the availability and cost of financing for acquisition or recapitalization transactions and the disclosure in Steven G. Mihaylo's definitive proxy statement, which has only recently become available. In addition, given that the second quarter is concluding, the Special Committee believes that Inter–Tel stockholders should have the benefit of an update regarding the Company's preliminary second quarter sales results, which the Company expects to announce at the end of next week.
>
> * * *
>
> We also believe it is vital that stockholders consider the letter we recently received from Mitel Networks Corporation informing us that Mitel cannot increase the purchase price in its merger agreement, and the reasons they stated for that decision. In addition, the Special Committee believes it is important to note that there have been significant changes in Inter–Tel's stockholder base since the record date for the special meeting, and that no other bidder has made a proposal to acquire the Company.[22]

As the plaintiff points out, the press release did not indicate that as of the time the Special Committee decided to postpone the meeting, a majority of the outstanding shares had (subject to the right to change their vote before the polls closed) registered opposition to the Merger, and had voted to oppose an adjournment. Nor does the press release note that the Special Committee had been advised by its proxy solicitors that a move in the record date would encourage arbitrageurs to buy more shares that could be voted at the rescheduled meeting.

But contrary to the plaintiff's arguments, the Special Committee's failure to spell out the fact that the Merger would have faced certain defeat had the June 29 vote gone forward did not obscure that obvious reality, and it did not deceive any reasonable market participant. In announcements made after the postponement, Mihaylo did everything he could to impugn the Special Committee's motivations for postponing the special meeting, accusing the Special Committee members of engaging in "delay tactics," suggesting that if the directors had the vote they wouldn't have postponed the meeting by calling the postponement a "desperate attempt ... to salvage [an] undervalued

---

**20.** Deposition of Norman Stout at 139.

**21.** PX 88.

**22.** *Id.*

buyout deal." [23] Mihaylo "urge[d] stockholders who [had] already voted against the merger to remain resolute" in their opposition.[24] The plaintiff himself, an individual who holds only 100 shares of Inter–Tel, testified at his deposition: "It is my understanding that they didn't have enough yes votes ... that's why they cancelled it.... Basically, if they had enough yes votes, they would have gone forward with the meeting." [25]

On June 30, the full Inter–Tel board met and ratified the rescheduling of the meeting. The new meeting date was set for July 23, and a new record date of July 9 was adopted. The board also determined to hold an annual meeting on September 12 if the Merger was not approved.

As one might expect, Mihaylo and his nominees on the board opposed the ratification vote, with Mihaylo generally arguing that the rescheduling was an unfair attempt to get the Merger approved by, among other things, allowing " 'hot money' into the stock." [26] At the meeting, Mihaylo read an argumentative memorandum that contained this and a variety of other charges. Among them was to indicate that he had heard a rumor that company management had purposely encouraged a slow down in sales to influence the Merger vote. Neither at the meeting, nor in any other forum, has Mihaylo backed up that inflammatory charge of gross disloyalty with reliable evidence of any kind, for example, with a sworn affidavit.

At that meeting, Mihaylo also complained that he had not been given a chance to outbid Mitel and wanted 90 days to formulate a topping bid. Cappello, the Special Committee Chairman, retorted by accurately referring to the opportunity Mi-

haylo had had to conduct due diligence for more than a year. To that point, the Chairman noted that Mihaylo had been permitted to have the respected firm of McKinsey & Co. receive due diligence about Inter–Tel, due diligence that it could use to help Mihaylo put together an alliance to make a fully-financed offer for all shares. Cappello also noted that the board had the contractual flexibility to accept a firm offer from Mihaylo that was higher than Mitel's bid. Mihaylo was also asked to provide the Special Committee with a copy of his financing commitments for the Recap Proposal and guarantees regarding the price at which Inter–Tel shares would trade after a $28 buyback. Mihaylo gave only unsatisfactory, noncommittal responses to these requests.

### E.

On July 2, Inter–Tel announced the date of the rescheduled meeting and the new record date. Because the record date was more than a week after the announcement, additional time was given to arbitrageurs as well as all other investors to buy Inter–Tel stock that could be voted at the meeting. After concerns were raised about whether the new meeting date of July 23 complied with the minimum notice requirements of § 251(c) of the DGCL, the meeting was moved to August 2.

During this period, Inter–Tel and Mihaylo kept up their battle. On July 6, Inter–Tel announced preliminary results for the second quarter of FY 2007. It indicated that those results had fallen short of the projections contained in the Merger proxy statement and that "we also expect to be well below projected net sales for the second half of 2007 and the full

**23.** PX 130.

**24.** *Id.*

**25.** Deposition of Vernon A. Mercier at 30–31.

**26.** PX 139.

year 2007, based on the current sales trends and trajectory." [27] The press release did not contain any revised projections, just that management expected not to meet the level previously estimated.

During the following weeks, Inter–Tel compiled information to buttress its case for the Merger, trying to show why the product and M & A market dynamics in July 2007 justified a different position regarding the advisability of a sale of the company than the board had taken in autumn 2006. On July 23, Inter–Tel issued a press release indicating revised projections for the third and fourth quarters of 2007 and that it expected total 2007 net sales of $448 to $459 million, which was 8% to 10% lower than the previous projected level of $498 million. The company also issued its final second quarter results, which were in line with the results announced on July 6.

As the plaintiff points out, Inter–Tel did not base its third and fourth quarter projections on any precise mathematical or scientific analysis of Inter–Tel's sales prospects for the coming months. In response to discovery requests from the plaintiff, Inter–Tel essentially admitted that no written analysis reflecting revisions to Inter–Tel's third and fourth quarter 2007 projections existed. But then again, the Special Committee did not lead stockholders to believe that the revised projections were based on a detailed study. Rather, they were simply management's revised estimates of the company's likely full year performance. The July 23 press release stated that "the Company's actual first and second quarter 2007 results [and] the current sales trends and trajectory reflected in those first-half results." [28] In terms of number of systems sold, sales for the first half of 2007 lagged sales from the same period in the previous year by more than 14%. [29]

The revised third and fourth quarter projections released on July 23 did not reflect monumental changes to Inter–Tel's previously expected performance, as the projected third and fourth quarter figures largely stem from the fact that the company was unable to achieve the optimistic growth that it had hoped for in the first half of the year, and on which the original third and fourth quarter numbers were, to an extent, premised. Historically, Inter–Tel's combined third and fourth quarter sales were substantially similar to its first half sales. But in order to reach the originally projected figures, Inter–Tel needed an increase of 35% in the number of systems sold in the third quarter over second quarter sales. Inter–Tel had not recently experienced that kind of quarter-over-quarter growth, and its management believed no reason existed in July to support a reasonable expectation that that kind of extraordinary growth would be forthcoming.

Mihaylo took the position that the Special Committee was low-balling Inter–Tel's prospects and that Inter–Tel was more valuable. Inter–Tel responded that interested buyers (including Mihaylo) had had plenty of chance to make a better bid, that there was no prospect Mitel was moving up its bid in view of the company's performance and internal strife and the realities of the current debt markets.

The plaintiff claims that the battle wore down institutional investors. He also claims that the move in the record date enabled investors to alter their portfolios in ways that motivated a change in posi-

27. PX 131.

28. PX 117.

29. *See* Letter of S. Mark Hurd to the court (Aug. 8, 2007), at Ex. B.

tion. In particular, the plaintiff points to Millennium (a previous favorite of his), which had filed a 13D on June 14 opposing the Merger. On July 19, Millennium changed its mind and announced its intent to support the Merger for the following reasons:

> Given the preannounced second quarter earnings short fall at the Issuer, as well as the deteriorating credit markets, [Millennium] believe[s] that the immediate and fixed consideration being offered in the [Mitel Merger] outweigh the risks associated with the implementation of the Mr. Mihaylo's recapitalization plan. At this juncture, [Millennium] has concluded that on a risk adjusted basis, consummation of the transaction at the current price is the best outcome for our investors.[30]

The plaintiff claims that Millennium's position was motivated by its desire to reap short-term profits it made on shares bought in June, after the original record date. Notably, Millennium only owned 400,313 shares on the original record date of May 25, 2007, but had increased its ownership to double that amount on June 14, when it first opposed the Merger, having bought shares at a price below Mitel's offer. On the revised record date of July 9, Millennium owned about the same amount of shares as it did on June 14, but could now vote nearly its whole position. The plaintiff claims Millennium had an incentive to approve the Merger and reap a quick profit on its brief tenure as an Inter-Tel stockholder. It claims other investors were in the same position. As will be discussed, the plaintiff ignores the fact that sophisticated investors like Millennium could also find a way to make short-term profits from a leveraged recapitalization of the kind Mihaylo supported, and

which could have been implemented in early autumn if Mihaylo obtained a majority of the board.

Complicating things for the plaintiff even more, however, is what ISS did next. ISS is another player whose views on the Merger the plaintiff touted when they accorded with his own. After hearing at length from both Mihaylo and Inter-Tel, ISS changed its position on the Merger. Although ISS indicated continuing displeasure with Inter-Tel's failure to run a formal auction, it stated the following in recommending that its clients vote yes:

> We note that since our initial analysis, new information regarding [Inter-Tel's] 2QFY2007 financial performance (announced on July 23, 2007) and changes in the credit market, have raised concerns about the potential downside risk to Inter-Tel's stock price, if the transaction is voted down. Based on our review of Inter-Tel's 2QFY2007 fundamental performance, discussions with institutional investors, and implied valuations, we now recommend shareholders to vote FOR the proposed transaction.

> \* \* \*

> [W]e believe that the current [Mitel] offer is fair. Furthermore, the sustainability of a 'transaction premium' in the stock price now appears unlikely, as the recent weakness in the credit market reduces the likelihood of an alternative leveraged buyout offer. As such, we recommend shareholders vote FOR the proposed merger transaction.[31]

Following this recommendation, a large number of ISS clients who had been prepared to vote no on June 29 took ISS's advice and changed their position on the Merger. This included, as we shall see, a

**30.** PX 114.

**31.** PX 121.

number of mutual fund complexes whose share holdings on the second record date of July 9 were identical to their holdings on the original record date of May. They changed their votes from no to yes. Many of these complexes were, as our public markets go, long-term holders, and ran funds tied to indices that included Inter–Tel.

### F.

The very next day after ISS changed its recommendation, Mihaylo pulled his Recap Proposal. He premised his withdrawal on the company's reduction in its projections. This move was no doubt seen by the market as an important one, which cast grave doubt on Mihaylo's credibility as a rival bidder.

Such doubt would have been entirely rational. Mihaylo was Inter–Tel's founder. He was on the board and, although excluded from the Special Committee, continued to have access to a tremendous amount of non-public information regarding Inter–Tel and its performance. Up until July 27, he had expressed great bullishness about Inter–Tel, and even in his withdrawal announcement, he indicated that he believed that there was "great intrinsic value in the Company which is yet to be captured by its shareholder base."[32] Indeed, in opposing the Special Committee's decision to postpone the meeting, Mihaylo had said he did not believe the company's lowered projections.

What Mihaylo failed to explain is why hostile bids have been financed for many decades by parties with no inside knowledge, and yet he, as a director, former CEO of more than 30 years, and owner of 19% of the company's shares, could not make a firm Recap Proposal or a firm all shares, all cash bid. That failure is even more glaring given that Mihaylo had been able to have his financial advisors receive non-public financial information to assist him in bidding. Those advisors included McKinsey, which was well-suited to help him develop his own business model. If Mihaylo truly believed that the Special Committee was low-balling Inter–Tel's prospects, he and his advisors were well positioned to act on a contrary belief and build a bid based on a more realistic assessment of the company's future.

Previously, of course, Mihaylo had also been partners with Vector Capital, but only made a maximum bid of $23.25. And Vector Capital had been given what confidential information it needed to top Mitel in the summer of 2007. But like Mihaylo himself, Vector also went away without making a real bid.

Mihaylo's withdrawal, when combined with Vector's prior retreat and Mitel's refusal to budge, made clear that the real alternatives for the Inter–Tel stockholders were to accept the Merger at $25.60 per share, or to remain stockholders in an independent Inter–Tel. Then on September 12, they could decide whether to reinstall Mihaylo as the key manager or to continue under the current incumbents, with the potential for continued strife because the company's cumulative voting system might perpetuate a fractured board. Mihaylo had essentially confessed that he could not or would not present a firm bid or strategic alternative that promised an immediate value exceeding what Mitel had offered.

### G.

On August 2, the special meeting on the Merger was actually held. Over 87% of the outstanding shares were voted. Over 62% of Inter–Tel's 27.3 million outstanding

32. DX 12.

shares were voted in favor of the Merger, with about 25% against. Of the shares voted, nearly 72% voted for the Merger. Of the shares not controlled by Mihaylo, more than 90% of the shares voted were in favor of the Merger. In fact, the stockholders this time even approved the second resolution authorizing an adjournment if necessary to gather more votes in favor of the Merger.[33]

Contrary to the plaintiff's argument, the Merger vote does not appear to have been influenced in any outcome-affecting manner by trading between the record dates. An exhibit illustrating the voting behavior of Inter–Tel's 20 largest stockholders other than Mihaylo demonstrates that the result was different because holders who held large amounts of stock on both record dates had changed their mind.[34] On June 29, these holders controlled over 10.6 million votes. Of those votes, over 8.6 million were going to be voted no.

On August 2, these holders controlled another 750,000 shares or so, it is true. But what is more material is that of the nearly 11.4 million they could vote, nearly 11.2 million were voted yes. A large number of respected investment managers who run index and other more patient capital[35] —including Barclays, Vanguard, Mellon,

and the New York State Teachers' Retirement Fund—held exactly the same number of shares on each record date. But these managers, like ISS, changed their view on the Mitel Merger from negative to positive. That was also true of the company's second largest stockholder, Kayne Anderson Rudnick. It owned the same shares—over 1.5 million—on each record date. It was going to vote no on June 29 but voted yes on August 2.

On the record before me, therefore, the reason why the vote came out differently on August 2 than it would have on June 29 was not because the stockholders eligible to vote were different, but because stockholder sentiment regarding the advisability of the Merger had changed.

### III.

The plaintiff seeks a preliminary injunction against the closing of the Mitel Merger. He has been more than a tad equivocal about his ultimate goal. Although he voted no on the Merger, he has suggested in his papers that a preliminary injunction need not sound the death knell for the Mitel Merger and at oral argument his counsel suggested that I require that the Merger be put up for another vote at the

---

33. Mihaylo apparently showed up at the August 2 meeting and made statements to the effect that he believed that Inter–Tel management was improperly trying to downplay Inter–Tel's real prospects. The plaintiff put in a hearsay affidavit from someone recounting Mihaylo's charges. Inter–Tel filed sworn affidavits addressing this hearsay and plausibly rebutting it. I give no weight to the plaintiff's argument on this score. Mihaylo is well aware of this litigation, but he has never sought to intervene, and has never proffered an affidavit for the plaintiff. Without underestimating the time constraints under which the plaintiff has had to operate, I cannot buttress an injunction on speculative charges unsupported by reliable evidence, especially when the source has not submitted sworn testimony by affidavit and thereby subjected

himself to cross-examination. In this respect, I note also that Mihaylo's understandable emotional feelings about Inter–Tel (and his replacement as its CEO) resonate in his various statements accusing the Special Committee of wrongdoing. I cannot give those statements weight, given the lack of objective evidence supporting them or direct testimony by him, especially in view of the fact that the record illustrates that Mihaylo, despite his public denials, was given an ample opportunity to present a real topping bid but did not.

34. Declaration of Alan M. Miller at Ex. A.

35. Patient admittedly being a relative term in our public capital markets.

annual meeting scheduled for September 12.

As the Special Committee points out, there is some non-trivial risk that the Merger will go away if another vote is ordered. The Merger Agreement itself gives Mitel some substantial arguments in that direction.[36] As important, delay risks create an incentive for Mitel perhaps to conclude to move on and simply pay the $20 million reverse break fee that is the only penalty for it if it walks. As a prudential matter, what is most obvious is that a preliminary injunction against the Merger's consummation until another vote is held should only issue if the court is certain that that is in the stockholders' best interests and is able to articulate convincing reasons that justify that determination. In deciding whether to grant an injunction, I will apply the familiar test, which does not require repetition.[37]

### A.

As an initial matter, I acknowledge the fact that, at the SEC's prodding, Inter–Tel included on its proxy ballot a proposal regarding whether or not to adjourn the special meeting if there were not sufficient votes to approve the Merger and that a majority of Inter–Tel's stockholders voted against an adjournment. That puts the Special Committee in an even less graceful position to seek to justify its actions in calling a time out on the Merger vote. That gracelessness is compounded by the fact that when a group of intervenors in these proceedings filed a very late applica-

tion for an injunction hearing, the Special Committee's June 21 response cited its desire to avoid having to put off the June 29 Merger vote in opposing expedition. That response was, of course, also grounded in the lack of color in the intervenors' arguments (a position I found meritorious) and also reflected the rote muscular impulses of well-trained corporate defense lawyers. Nonetheless, that the Special Committee came to this court on June 21 and asked to avoid proceedings that might delay the June 29 meeting adds piquancy, if that is possible, to a set of circumstances that already seem designed to test the limits of the Burkean model.

But as a formal matter, the special meeting was not adjourned because it was never convened in the first place. Rather, the Special Committee postponed the special meeting on the morning it was scheduled, and the plaintiff does not question the Special Committee's legal authority to do that.[38] As a substantive matter, the only issue set to be voted on at the meeting was the Merger and the plaintiff's arguments are based on what he perceives to be the Special Committee's inequitable motivations in seeking delay. The issue therefore is whether the Special Committee has articulated a sufficient justification in equity for its actions.

As is easy to grasp, the nettlesome problem here is what standard of review applies to the plaintiff's equitable claim. The plaintiff, of course, contends that this is a quintessential case calling for the application of the standard of review announced

---

**36.** PX 3 at § 10.01(b) (providing that Mitel or Inter–Tel can terminate the Merger Agreement if "consummation of the Merger would violate any nonappealable final order, decree or judgment"); *Id.* at § 10.01(d) (providing that only Mitel may terminate upon breach of any representation by Inter–Tel, including Inter–Tel's representation that the Merger will not violate any material applicable law).

**37.** *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del.1985) (articulating preliminary injunction test).

**38.** If the special meeting had actually been convened, Inter–Tel's bylaws would seem to have required stockholder consent to adjourn.

in the landmark decision of *Blasius Industries, Inc. v. Atlas Corp.*[39] He says that the Inter–Tel Special Committee acted for the primary purpose of thwarting the opportunity for the majority of the stockholders of Inter–Tel to express their opposition to the Mitel Merger on June 29. Therefore, he contends that the Special Committee must demonstrate a compelling justification for flouting the majority will. Because the Special Committee in justifying their delay has only pointed to a number of factors that stockholders had already had at least some chance to consider before June 29, the plaintiff claims that the Special Committee has not met the extremely heavy burden it must bear under *Blasius*. Furthermore, the plaintiff argues that to the extent that the Special Committee moved the record date in order to give more power to short-term investors, it inequitably tainted the electoral process.

For their part, the Special Committee argues that the plaintiff has failed to identify any self-interest on their part that would improperly motivate their support for the Mitel Merger. As the Special Committee points out, its members expect to lose their jobs as soon as the Mitel Merger is consummated. Only if the Merger is defeated do they stand a reasonable prospect of continuing. Although Mihaylo is threatening another proxy contest, this time ISS and others will have to consider whether to give Mihaylo actual control of the board. Given that this is the dynamic, the Special Committee says it is impossible to attribute their motives to a desire to entrench themselves, and that their actions should be judged under the deferential business judgment rule standard. As they point out, this standard of review was applied to director action to postpone a merger vote and set a new record date in the recent *In re MONY Group, Inc. Shareholder Litigation*[40] case, although only after a searching inquiry into the necessity and motivation for, as well as the reasonableness and effect of, the board's action.[41]

It would hardly be indiscreet for me to acknowledge yet again the widely known reality that our law has struggled to define with certainty the standard of review this court should use to evaluate director action affecting the conduct of corporate elections. The results in the cases make sense, as the decisions do a good job of sorting between situations when directors have unfairly manipulated the electoral process to entrench themselves against insurgents and those when directors have properly used their authority over the election process for good faith reasons that do not compromise the integrity of the election process. The problem that remains though is that there is no certain prism through which judges are to view cases like this. The great strength of *Blasius*—its reminder of the importance of

39. 564 A.2d 651 (Del.Ch.1988).

40. 853 A.2d 661 (Del.Ch.2004).

41. *MONY* held that *Blasius* did not apply when a board of directors whose members stood to lose their positions if a merger was approved moved the merger vote so that stockholders could consider additional information and so that a new record date would be set ensuring that the electorate more closely reflected the actual ownership of the company's shares as of the time of the vote. *Id.* Because the postponement still left the stockholders free to reject the merger, there was no preclusive or coercive effect and no disenfranchisement. Moreover, because the directors would leave office if their own recommendation were accepted to approve the merger, they were disinterested. In these circumstances involving a reasonable exercise of director discretion, the court concluded that the board's decision was entitled to be reviewed under the business judgment rule. *Id.* at 667.

the director election process and the barrier the decision draws to the acceptance of the bizarre doctrine of "substantive coercion" as to the question of who should constitute the board [42]—came along with some overbroad language that rendered the standard of review articulated in the case too crude a tool for regular employment. As has been noted elsewhere, the trigger for the test's application—director action that has the primary purpose of disenfranchisement [43]—is so pejorative that it is more a label for a result than a useful guide to determining what standard of review should be used by a judge to reach an appropriate result.[44] As a result, decisions in the wake of Blasius tended to involve threshold exertions in reasoning as to why director action influencing the ability of stockholders to act did not amount to disenfranchisement, thus obviating the need to apply Blasius at all.[45]

Blasius also employed in the corporate context language that has totemic meaning for those steeped in our legal tradition. The words "compelling justification" echo the almost impossible to satisfy standards used under the First and Fourteenth Amendments to address restrictions on political speech and governmental classifications based on race.[46] For that reason, our Supreme Court has candidly announced that Blasius is so strict a test that it is "applied rarely." [47]

As the case law developed, it became increasingly obvious that the traditional skepticism and strong scrutiny that Delaware had always employed toward director actions that might unfairly taint the election process—a tradition that Blasius acknowledged and that importantly is reflected in Schnell v. Chris–Craft Industries, Inc.[48]—needed to be preserved, but applied in a more workable way than Blasius articulated. Because cases involving electorally-directed action often arose in the M & A context, it was natural that

42. See Leo E. Strine, Jr., If Corporate Action Is Lawful, Presumably There Are Circumstances In Which It Is Equitable To Take That Action: The Implicit Corollary To The Rule Of Schnell v. Chris–Craft, 60 Bus Law 877, 891–93 & n. 59 (2005) (discussing the historical context in which Blasius arose and the important role of Blasius in cabining substantive coercion and ensuring that the proxy route to an acquisition was not cut off).

43. E.g., Blasius, 564 A.2d at 660–661; Stroud, 606 A.2d at 92 (stating the Blasius standard is invoked only if "the 'primary purpose' of the board's action [is] to interfere with or impede exercise of the shareholder franchise"); State of Wisconsin Inv. Bd. v. Peerless Systems Corp., 2000 WL 1805376 at *10 (Del.Ch.2000) (citing Stroud for the test to determine when the Blasius standard is invoked).

44. William T. Allen, et al., Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law, 56 Bus. Law. 1287, 1298 & 1311–16 (2001) (hereinafter "Function Over Form") ("[T]he truly functional standard of review is the test actually used by the judge to reach a decision, not the ritualistic verbal standard that in truth functions only as a conclusory statement of the case's outcome"); Chesapeake, 771 A.2d at 323 ("In reality, invocation of the Blasius standard usually signals that the court will invalidate the board action under examination. Failure to invoke Blasius typically indicates that the board action survived (or will survive) review under Unocal.").

45. E.g., Stahl v. Apple Bancorp, Inc., 579 A.2d 1115, 1122–23 (Del.Ch.1990); Chesapeake Corp. v. Shore, 771 A.2d 293, 322–23 & n. 58 (Del.Ch.2000) (gathering cases of this kind); Function Over Form at 1314 n. 107 (same).

46. See, e.g., Shaw v. Hunt, 517 U.S. 899, 907–08, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (race); First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (speech).

47. Williams v. Geier, 671 A.2d 1368, 1376 (Del.1996).

48. 285 A.2d 437 (Del.1971).

judges would give thought to the *Unocal*[49] standard, because they had to apply that standard anyway.[50]

Happily, looking in that direction made logical sense, too. *Unocal,* when applied faithfully, requires directors to bear the burden to show their actions were reasonable.[51] Implicitly, but importantly as I will soon articulate, that requires directors to convince the court that their actions are motivated by a good faith concern for the stockholders' best interests, and not by a desire to entrench or enrich themselves. In other words, to satisfy the *Unocal* burden, directors must at minimum convince the court that they have not acted for an inequitable purpose.[52] Thus *Unocal* subsumes the question of loyalty that pervades all fiduciary duty cases, which is whether the directors have acted for proper reasons. This aspect of the test thus addresses issues of good faith such as were at stake in *Schnell.*[53]

But *Unocal* does even more. The origins of *Unocal* as a standard of review addressing takeover defenses has probably led to too much emphasis on the word "threat" in the test.[54] The core of *Unocal's* utility really rests in the burden it asserts on directors to: (1) identify the proper corporate objectives served by their actions; and (2) justify their actions as reasonable in relationship to those objectives. Conceived in that way, *Unocal* is itself reminiscent of some federal Constitutional standards of review, which smoke out the actual objective supposedly motivating challenged governmental action and require a fit (of looser or tighter nature) between that objective and the means used.[55] This approach to analyzing behavior also is useful in exposing pre-textual justifications.[56] Because there is a burden on the party in power to identify its legitimate objectives and to explain its actions as necessary to advance those objections, flimsy pretense stands a greater chance of being revealed.[57]

---

**49.** *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985).

**50.** *See, e.g., Liquid Audio,* 813 A.2d at 1129; *see also Function Over Form* at 1316 ("The post-*Blasius* experience has shown that the *Unocal/Unitrin* analytical framework is fully adequate to capture the voting franchise concerns that animated *Blasius,* so long as the court applies *Unocal* with a gimlet eye out for inequitably motivated electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects.") (quotation omitted).

**51.** *Unocal,* 493 A.2d at 955.

**52.** *Id.*

**53.** 285 A.2d at 439 (finding that "utiliz[ing] the corporate machinery and the Delaware Law for the purpose of perpetuating [management] in office; and, to that end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management" are "inequitable pur-

poses, contrary to established principles of corporate democracy").

**54.** *See Unocal,* 493 A.2d at 955 ("If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed.")

**55.** *E.g., Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that when a discriminatory statutory classification is subject to intermediate constitutional scrutiny, it is invalid unless substantially related to an important state interest).

**56.** *See, e.g., Mississippi University for Women v. Hogan,* 458 U.S. 718, 730, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (holding that an alleged legitimate objective may not be pretextual and must be the actual purpose underlying a discriminatory statutory classification).

**57.** *See, e.g., Phillips v. Insituform of North America, Inc.,* 1987 WL 16285, at *5 (Del.Ch. 1987) (finding that a board's proffered justifi-

In the context of defensive action, two useful considerations have been used by judges applying *Unocal* to assess the question of fit, namely, whether the directors had precluded a takeover bid or coerced stockholders to accept another alternative.[58] These considerations also have relevance to director actions influencing the conduct of elections. If director action has the effect of precluding the ability of stockholders from exercising their electoral power on a matter committed to them by statute, charter, or bylaw, that effect suggests that there has been a disenfranchisement.[59] Similarly, if director action has the effect of coercing stockholders into accepting an alternative of the directors' choosing rather than hav-

ing free choice to vote as they choose, that effect also suggests inequity.[60] Because these metrics are actually useful in assessing whether director behavior should be proscribed, decisions following *Blasius* have often focused on whether the director action challenged was preclusive or coercive of stockholder choice.[61]

An additional problem has existed. In dictum, *Blasius* seemed to suggest that its reasoning applied to all stockholder votes, not just those involving the election of directors.[62] But the reasoning of *Blasius* is far less powerful when the matter up for consideration has little or no bearing on whether the directors will continue in office.[63] Here's a news flash: directors are

---

cations for its actions were a pretext and that the board violated its fiduciary duties under *Unocal*).

58. *See Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1387 (Del.1995) (noting "this Court has consistently recognized that defensive measures which are either preclusive or coercive are included within the common law definition of draconian").

59. *Chesapeake*, 771 A.2d at 322–23.

60. *Id.*

61. *See id.* at 323 (observing "a typical predicate to the invocation of *Blasius* is the court's consideration of *Unocal* factors, such as the board's purpose and whether the board's actions have preclusive or coercive effects on the electorate"); *Function Over Form* at 1314 ("The elements of the *Unocal/Unitrin* analysis therefore gave courts the tool to answer the predicate question to the application of *Blasius*—did the directors act with the primary purpose of disenfranchisement?").

62. *Blasius*, 564 A.2d at 660 ("[A] decision by the board to act for the primary purpose of preventing the effectiveness of a shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance. That is, of course, true in a very specific way in this case which deals with the question who should constitute

the board of directors of the corporation, *but it will be true in every instance in which an incumbent board seeks to thwart a shareholder majority.*") (emphasis added).

63. The essential logic and policy consequences of *Blasius* were well captured in *Liquid Audio:*

Maintaining a proper balance in the allocation of power between the stockholders' right *to elect directors* and the board of directors' right to manage the corporation is dependent upon the stockholders' unimpeded right to vote effectively *in an election of directors.* This Court has repeatedly stated that, if the stockholders are not satisfied with the management or actions of their elected representatives on the board of directors, the power of corporate democracy is available to the stockholders *to replace the incumbent directors when they stand for re-election.* Two decades ago, this Court held: The courts of this State will not allow the wrongful subversion of corporate democracy by manipulation of the corporate machinery or by machinations under the cloak of Delaware law. Accordingly, careful judicial scrutiny will be given a situation in which the right to vote *for the election of successor directors* has been effectively frustrated and denied.

*Liquid Audio*, 813 A.2d at 1127 (quoting *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 (Del. 1982)) (emphasis added).

not supposed to be neutral with regard to matters they propose for stockholder action.[64] As a matter of fiduciary duty, directors should not be advising stockholders to vote for transactions or charter changes unless the directors believe those measures are in the stockholders' best interests. And when directors believe that measures are in the stockholders' best interests, they have a fiduciary duty to pursue the implementation of those measures in an efficient fashion. That does not mean, of course, that directors can use inequitable means that dupe or dragoon stockholders into consenting. But it does mean that directors can use the legal means at their disposal in order to pursue stockholder approval, means that often include tools like the ability to set and revise meeting dates or to adjourn a convened meeting.[65] Post-*Blasius* cases have wrestled with that reality and display understandable discomfort about using such a stringent standard of review in circumstances when a stockholder vote has no bearing on issues of corporate control.[66]

The Delaware Supreme Court's relatively recent decision in *MM Companies, Inc. v. Liquid Audio, Inc.*[67] can be read as signaling that Court's recognition that a clearer approach to corporate election disputes was necessary, and that the stringency of the *Blasius* approach should be reserved largely for director election contests or election contests having consequences for corporate control.[68] In that case, the Supreme Court strove to bring the *Blasius* and *Unocal* standards together in a workable manner. Thus, the Court stated:

> When the *primary purpose* of a board of directors' defensive measure is to interfere with or impede the effective exercise of the shareholder franchise in a contested election for directors, the board must first demonstrate a compelling justification for such action as a condition precedent to any judicial consideration of reasonableness and proportionately.... To invoke the *Blasius* compelling justification standard of review *within* an application of the *Unocal* standard of review, the defensive actions of the board only need to be taken for the primary purpose of interfering with or impeding the effectiveness of the stockholder vote in a contested election for directors.[69]

One can read *Liquid Audio* as suggesting that the heightened scrutiny that *Unocal's* fit test employs to assess defensive actions by directors, was to be ratcheted up to a form of strict scrutiny when the directors' actions affected the corporate franchise. Although it does not use those

---

64. See *MONY*, 853 A.2d at 676–76 ("[O]nce a board of directors deems a merger agreement favorable, it may employ various legal powers to achieve a favorable outcome on a shareholder vote required to approve that agreement.").

65. *Blasius* itself recognized that the key issue is whether directors were ultimately preventing stockholders from freely exercising the right to vote on a matter committed to them. *Blasius*, 564 A.2d at 663 ("[T]here is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of *foreclosing* effective shareholder action.") (emphasis added).

66. E.g., *MONY*, 853 A.2d 661, 675 n. 51 (Del. Ch.2004) ("*Blasius* is not easily or readily applied outside the context of matters touching on directorial control, as its demanding standard could unduly limit the legitimate exercise of directorial power and discretion in other contexts."); *Peerless*, 2000 WL 1805376 at *8–9 (Del.Ch.2000).

67. 813 A.2d 1118 (Del.2003).

68. *Id.* at 1130–32.

69. *Id.* at 1132 (emphasis in original).

precise words, *Liquid Audio* can be viewed as requiring the directors to show that their actions were reasonably necessary to advance a compelling corporate interest.[70]

That formulation is an improved one but still a problematic one. The extremely stringent "compelling justification" standard endures, and to my knowledge only one prior decision, as an alternative holding in extraordinary circumstances, has ever found it satisfied.[71] As a result, the temptation to avoid applying the standard as an actual means to make a decision rather than a post-hoc label will remain. Relatedly, because the test is still technically distinct from the circumstantial reasonableness tests used in many M & A contexts, an unfortunate proliferation of standards of review persists.

■ Consistent with the directional impulse of *Liquid Audio*, I believe that the standard of review that ought to be employed in this case is a reasonableness standard consistent with the *Unocal* standard.[72] I recognize in so stating that some of the prior *Unocal* case law gave reason to fear that that standard, and the related *Revlon*[73] standard, were being denuded into simply another name for business judgment rule review. More recent decisional law, one hopes, has been truer to the test as written,[74] and our cases have universally recognized the need for close scrutiny of director action that could have the effect of influencing the outcome of corporate director elections or other stockholder votes having consequences for corporate control.

To be specific, I believe that in this case, the burden should be on the Inter–Tel board as an initial matter to identify a legitimate corporate objective served by its decision to reschedule the June 29 special meeting on the Mitel Merger and to set a new record date. As part of meeting that burden, the directors should bear the burden of persuasion to show that their motivations were proper and not selfish. That showing, however, is not sufficient to ultimately prevail. To ultimately succeed, the directors must show that their actions were reasonable in relation to their legitimate objective, and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particu-

---

70. *Id.* at 1129.

71. *Hollinger Int'l, Inc. v. Black,* 844 A.2d 1022, 1089 (Del. Ch. 2004) (after determining *Blasius* did not apply, holding that if *Blasius* did apply, the board had a compelling justification for any incidental burden on voting rights resulting from enacting a rights plan in response to a controlling stockholder's threat to use its voting control—which resulted from owning high-vote stock that gave the controller voting control with less than 20% of the economic equity—to facilitate serious breaches of contractual and fiduciary duties that had the intended effect of wrongly diverting a sales opportunity belonging to the corporation to the controller).

72. *See Chesapeake,* 771 A.2d at 323 ("If *Unocal* is applied by the court with a gimlet eye out for inequitably motivated electoral manip-

ulations or for subjectively well-intentioned board action that has preclusive or coercive effects, the need for an additional standard of review is substantially lessened. Stated differently, it may be optimal simply for Delaware courts to infuse our *Unocal* analyses with the spirit animating *Blasius* and not hesitate to use our remedial powers where an inequitable distortion of corporate democracy has occurred.").

73. *Revlon,* 506 A.2d at 179.

74. *E.g., In re Topps Co. S'holders Litig.,* 926 A.2d 58 (Del.Ch.2007); *Chesapeake,* 771 A.2d 293; *ACE Ltd. v. Capital Re Corp.,* 747 A.2d 95 (Del.Ch.1999); *Mentor Graphics Corp. v. Quickturn Design Systems, Inc.,* 728 A.2d 25 (Del.Ch.1998), aff'd, 721 A.2d 1281 (Del. 1998); *cf. Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914 (Del.2003).

lar way. If for some reason, the fit between means and end is not reasonable, the directors would also come up short.[75]

Lest there be confusion, I do not believe that the use of a test of this kind should signal a tolerance of the concept of "substantive coercion" [76] in the director election process. The notion that directors know better than the stockholders about who should be on the board is no justification at all. So long as courts are vigilant, however, in recognizing this obvious proposition, a test along the lines identified can be used with integrity as a genuine standard of review to review board action addressing the conduct of elections.

Frankly, I do not believe that this test should be used as to director conduct not affecting either an election of directors or a vote touching on matters of corporate control.[77] This test is a potent one that should not be used in garden variety situations, when more traditional tools are available to police self-dealing or improperly motivated director action.[78]

---

75. Notably, Chancellor Allen used a mode of analysis similar to that outlined here to address a decision of a board to hold an annual meeting later than it was intending because it was facing a proxy contest for board control from a takeover bidder. *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115 (Del.Ch.1990). Although Chancellor Allen reached his result by refusing to apply *Blasius*, he did so on grounds that prove the utility of a more straight-forward standard of review. Because the Apple Bancorp board acted for the legitimate purpose of allowing more time for the stockholders to consider information about the rival's bid that was relevant to the stockholders' voting decision and delayed, but did not preclude, a stockholder vote to replace the board, the board's actions did not impair the "exercise of the franchise." *Id.* at 1123. In other words, the board in good faith had advanced a legitimate corporate objective by means that were neither preclusive nor coercive. In fact, Chancellor Allen expressly justified his decision in part on the ground that the board's delay of the electoral contest had not "preclude[d] ... any stockholder from effectively exercising his vote...." *Id.* at 1122.

76. *See Paramount Communications, Inc. v. Time Inc.*, 571 A.2d 1140, 1153 n. 17 (Del. 1989) (using this term wrenched out of its original academic context).

77. *MONY*, 853 A.2d at 675 & n. 51.

78. The plaintiff, with some justification, cites to this court's decision in *Peerless*, 2000 WL 1805376, as supporting his preliminary injunction motion. In that case, this court employed the *Blasius* standard in reviewing whether to grant summary judgment against a board of directors that had adjourned a stockholder meeting as to only one of three items up for a vote. The other two items, which included a merger, had passed as the board had hoped. The third item, a proposal to add a substantial number of shares for issuance under the company's stock option plan, did not have enough votes for passage that day. The corporation's Chairman and CEO chaired the meeting. He stood to receive a material amount of any options granted under the proposal, if it was approved. When the proposal did not have enough votes to succeed, he, in accordance with the authority he had as chairman of the meeting under the company's bylaws, adjourned the meeting as to that proposal only and continued to solicit proxies. The board did not, however, "inform all of its stockholders that it had called the adjournment...." *Id.* at *11. Rather, it simply went out and tried to gather enough votes to put the proposal over the top.

On a summary judgment motion, this court held that the primary purpose of the adjournment was to "ensure the passage of" the proposal by "interfering with the shareholder vote." *Id.* Thus, it determined that the *Blasius* standard applied, even while acknowledging that it was "problematic" to apply the powerful *Blasius* standard to a stockholder vote in a situation that did not involve "entrenchment or control issues." *Id.* at *12. The court refused, however, to find that the board could not prove a compelling justification for its action. Even though the proposal was one that the board could promulgate again immediately upon a no vote, the court left open the possibility that it could be convinced on a trial record that the financial and practical consequences of having to start from

Unlike the Inter–Tel Special Committee, I am not troubled by the application of this form of reasonableness review to stockholder votes on mergers. For nearly a quarter of a century, Delaware law has subjected directors to reasonableness review as to much of their conduct in the M & A context. Here, for example, the Inter–Tel board is recommending a cash-out merger and had the duty under *Revlon* to act reasonably in pursuit of the highest value reasonably attainable. It does not seem to me to be shocking that the same directors would also be expected to prove that they acted reasonably if they took action that could have the effect of tilting the outcome of the vote on that merger. Furthermore, although it is true that the Inter–Tel board will lose their office if the Mitel Merger is approved, it is notable that the Special Committee members realized that if the Merger was defeated, the margin of defeat could be a subject of discussion in a proxy fight with Mihaylo at the September 12 annual meeting. And in the typical situation, the defeat of a board's favored merger is likely to have corporate control ramifications, as it suggests an opening for other buyers in the M & A market and for stockholder activists who might have their own ideas about how to better manage the corporation. Stated even more directly, even if there is some imprecision, it would be better to have clarity about the standard of review and to use the standard to decide cases, rather than to continue backing into the standard of review only after all the case-specific facts have been closely analyzed.[79]

scratch and incur all the costs of a brand-new special meeting and proxy solicitation might have justified the adjournment.

On its facts, *Peerless* is distinct from the situation I face here. For one thing, in *Peerless* the corporation considered the electorate informed enough to vote intelligently on two of the three ballot issues. It did not adjourn except for the proposal on which it had not generated enough stockholder support. More importantly, the proposal in *Peerless* was one that could be resubmitted to the stockholders freely at any later time. Here, if the Mitel Merger was voted down, Mitel could walk and the Inter–Tel stockholders could have irrevocably lost the chance to receive the offer.

Being less technical, it is not clear to me that the facts of *Peerless* do not illustrate the problem with employing too powerful a test in addressing corporate votes that do not involve the election of directors or matters of corporate control. If, as the court was concerned about in *Peerless*, the adjournment was not fairly announced and the corporation solicited proxies without facing the opposition that it would have faced if it had acted more openly by informing the entire electorate of the continuation of the contest for votes, a straight-forward finding of inequity under the principles articulated in *Schnell* could be made. Likewise, if the board's advocacy of the proposal was somehow tainted by the self-interest of the CEO and Chairman,

principles of entire fairness could have bite. Given that the court retains substantial authority using traditional forms of review to set aside even stockholder-approved action if the stockholder vote is compromised by misleading or incomplete disclosures, I am skeptical that adjournments as to votes not implicating director tenure or corporate control that are entirely consistent with authority that stockholders, via the corporate charter or by-laws, vest in directors or officers, or that otherwise rests in directors as a matter of their statutory authority, should be reviewable under a compelling justification standard or even under the *Unocal* standard. When (using the economically based sense of the terms employed by *Blasius*) the principal has given the agent authority to adjourn, there is no principal-agent problem other than the question of whether the agent has used its discretion on the subject consistent with its fiduciary duties. So long as the directors are motivated by a good faith belief that the proposal is in the stockholders' best interests, taking a short adjournment to gather additional votes in a fair way seems like the kind of business judgment the adjournment tool was designed to facilitate.

79. In so finding I approach the question from fundamentally the same position as this court's well-reasoned decision in *MONY*. The only difference is a practical one. The

Because it would be impossible and inappropriate for me to ignore the existence of *Liquid Audio* and other Delaware Supreme Court decisions continuing to refer to a compelling justification standard, I will apply the analysis I have outlined, which I believe is consistent with the direction the teaching in *Liquid Audio* logically leads, but will also expressly set forth whether I conclude that the Inter–Tel Special Committee has demonstrated a compelling justification for its actions.

### B.

■ As the starting point in my analysis, I address the question of whether the Inter–Tel Special Committee has convinced me that they in fact acted for reasons that were properly motivated. On that score, the record supports the conclusion that the Inter–Tel Special Committee was motivated by a good faith concern that the Mitel Merger was in the best interests of the Inter–Tel stockholders and that if the meeting was held as scheduled on June 29, the advantages the Merger promised to the stockholders would be irretrievably lost. In so finding, I do not blanch from acknowledging that the Special Committee took action precisely because they believed—in fact, knew to a virtual certainty—that if the Merger vote went forward on June 29, the Merger would have been soundly defeated.[80]

The plaintiff has not raised any argument at all questioning the independence of the Special Committee majority. Even as to Inter–Tel's CEO Stout, the plaintiff has been unable to suggest any substantial reason why Stout would favor a cash-out merger with Mitel over another higher-priced alternative or continuing as Inter-tel's CEO on a stand-alone basis if that would deliver more value. The plaintiff points to nothing about his severance package that was unusual and the plaintiff has not made any argument that Stout could have been fired with cause if Mihaylo was successful in taking over control of the board. In the event of a without cause dismissal, Stout would have stood to receive a substantial severance package.

In concluding on this record that the Special Committee acted in good faith, I note the absence of any evidence that the Special Committee failed patiently to explore the possibility of a more-valuable alternative takeover bid from interested parties. By contrast, it appears that the Special Committee diligently responded to all interested parties and tried to facilitate attractive bids. Certainly, Vector Capital received such treatment, and that was also true of even Mihaylo. And, of course, it bears repeating that the success of the Mitel Merger would speed, not slow, the departure of the Special Committee from their director offices.[81]

---

searching review used in *MONY* to get to the conclusion that the business judgment rule standard applied closely resembles a *Unocal* reasonableness review tailored to the electoral context. In my view, it would be preferable to simply use such an inquiry as the prism for cases of this type.

**80.** For this reason, this case is distinct from *MONY*. In that case, the board had collected yes votes on the merger from a majority of those who had granted proxies, but had not yet obtained a majority of the outstanding

votes. 853 A.2d at 669. That is, the *MONY* board was winning. *Cf. Stahl*, 579 A.2d at 1124 (finding that a board of directors' decision to postpone an anticipated annual meeting to gather information about alternatives to an announced proxy contest combined with a tender offer that the company's proxy solicitor indicated was likely to prevail if the company did not present an economic alternative was reasonable under *Unocal*, but noting that it did not face a situation where a meeting had already been scheduled and proxies counted).

My conclusion that the Special Committee acted for a proper purpose does not mean, of course, that they acted in an ideal manner. As will be discussed, the Special Committee should have been more forthright about the reason for postponing the special meeting. It would have more straightforward to simply say that they were postponing the meeting because it appeared that the stockholders were likely to vote down the Merger, that the Special Committee recognized that Mitel had a right to walk once that was done, and that the Special Committee believed it was in the best interests of the electorate for the meeting to be postponed so that the stockholders would have additional time to reflect on how to vote. The Special Committee could then have indicated that the factors it did identify in its press release moving the meeting were ones that it wished to give the stockholders more time to consider. That type of disclosure would have been refreshingly direct.

But I do not believe that the Special Committee members acted in bad faith simply because their press release (which was no doubt heavily lawyered) failed to expressly indicate that the Merger was going to fail if the vote was held on June 29 and that it put off the meeting because of that reality. I have no doubt that any reasonable stockholder, and certainly the institutional investors who own most of Inter-Tel's shares, got that. Certainly Mihaylo, who had also employed leading M & A proxy solicitors, knew that was the case and used that as an argument for continued resistance to the Mitel Merger, if he thought it a good reason.

In concluding that the Special Committee acted for the proper purpose of trying to do what they thought was best for the stockholders—to put the vote off so that they could rally more support for the Merger—I do not conclude they acted perfectly. As the plaintiff notes, the Special Committee's proxy solicitor indicated that a movement in the record date would not only allow actual holders of Inter-Tel stock who could not vote to do, it would do something more. A new prospective record date would, in Innisfree's view, allow arbitrageurs to buy additional shares at below the Merger price that could be voted. Because those shares could be bought at a price lower than the Merger price, arbitrageurs could make a profit by buying, voting for the Merger, and cashing in on the difference. The fact that the Special Committee dilated on this possibility in deciding to reschedule the special meeting and set a new record date was not disclosed publicly.

I will address later whether the nondisclosure of that fact, in itself, justifies an injunction. For now, I note that this failure to disclose this tactical motivation does not, in my view, call into question the Special Committee's honesty of purpose. The Special Committee's proxy solicitor was essentially its campaign tactician. The proxy solicitor was honestly reporting that there were existing holders of Inter-Tel who might buy even more shares if the record date was moved out.

I am reluctant to premise an injunction on the notion that some stockholders are "good" and others are "bad short-term-

---

81. *Compare MONY,* 853 A.2d at 677–78 (finding directors disinterested in moving merger vote when approval of the merger would guarantee their own removal from office), *with Aprahamian v. HBO & Co.,* 531 A.2d 1204, 1207–08 (Del.Ch.1987) (finding that a board's decision to postpone an annual meeting failed equitable review under *Schnell* when the decision was made on the eve of the meeting after the board learned it was about to be voted out of office).

ers." There are respectable public policy arguments that can be made for legislators and regulators to fashion statutes and regulations that require minimum holding periods, as a pre-condition to the exercise of certain rights the invocation of which impose costs on all stockholders. That has not been done with the stockholder franchise and a court is poorly positioned to craft sensible distinctions of that kind in the rush of a preliminary injunction motion.[82] To that point, the plaintiff is asking me to premise an injunction on the notion that stockholders who would buy into Inter–Tel's stock at below the Merger price are so focused on the short-term that they would not have rejected the Merger if Mihaylo had convinced them that his Recap Proposal was more valuable. But the plaintiff submits no rational economic argument why that is so.

The Special Committee made clear that it would hold an annual meeting on September 12 if the Merger was defeated. If Mihaylo or another bidder made a higher bid, I perceive no reason why hedge funds like Millennium would not have supported a higher value alternative. Buttressing an injunction on the notion that these investors would take a smaller harvest in the swelter of August over a larger one in Indian Summer is not something this record supports. Sophisticated short-term traders can reap profits from a variety of scenarios. Investors like these could hardly be thought to be in the pocket of the Special Committee. They are the ultimate free agents and will go where they perceive profits are to be made.

Notably, the plaintiff has not argued that the board was attempting to put votes in the hands of investors who were "short" the company. What it is arguing is a larger and much more debatable point about whether the American public markets are prone to give irrational weight to the chance to receive an immediate premium when a superior return might be attained by a stand-alone strategy. Does the market really value future cash flows rationally? The plaintiff is a tad inconsistent on this, however, because it preferred a stale record date that might well have resulted in votes being cast by stockholders who had cashed out. That is, the bad arbs and hedge funds who bought in, had obviously bought their shares from folks who were glad to take the profits that came with market prices generated by the Merger and Vector Capital's hint of a higher price. Those folks, one can surmise, had satisfied whatever long-term objective they had for their investment in Inter–Tel. Whether one likes it or not, the reality is that in most M & A situations, a large number of shares move into the hands of arbitrageurs as other investors take profits early and avoid the turbulence of the deal approval and consummation process.

The plaintiff also slights the fact that the change in the record date also gave an interloper a chance to gain a toehold. For example, if Vector Capital had finally determined to make a real bid, it could have used the opportunity afforded by the new record date to buy shares. So too could other investors, such as activist hedge funds, who had "ideas" about value creation at Inter–Tel, and whose ideas could attract support from other hedge funds. In this regard, it is notable that Inter–Tel did not selectively announce the record date, by tipping it to favored investors. It announced the new record and meeting

---

**82.** The concept of time-weighted voting has been around for many years. The DGCL does not embrace it.

dates widely to the entire market at the same time.

Even in a scenario where the likely alternative to the Merger was a stand-alone strategy, the plaintiff has fallen far short of convincing me that the Special Committee's facilitation of new purchases of shares that could be voted threatened to undermine the fairness of the Merger vote. In a recent high-profile situation well-known to this court involving Lear Corporation, the stockholders of a public company in a troubled industry turned down a premium-generating merger at a postponed meeting, even though the acquiror had increased its bid after ISS recommended a no vote and it was apparent the votes were not there. Even though the acquiror sweetened the pot, ISS believed that the higher price was still inadequate for stockholders to give up the value that would flow if the company remained independent and continued to recommend a no vote. The stockholders voted the deal down.

In the record, there is arguably conflicting evidence regarding whether the Special Committee viewed the change in the record date as a useful tool for securing the approval of the Merger. Innisfree clearly thought it would help. The Chairman of the Special Committee, Cappello, said that he was not sure one way or the other, as he did not know how any particular stockholders, including arbs and hedge funds, might ultimately vote at the postponed meeting.

The conflict is reconcilable. Cappello's uncertainty reflected his recognition that the factor that would ultimately determine how stockholders voted was whether, on the day of the Merger vote, the $25.60 Merger price was financially attractive in comparison to the value that would likely result for Inter–Tel stockholders if the Merger was rejected. The Special Committee had a big burden to bear in that regard and had to continue its duel with Mihaylo over that question but it thought with more time it could make its case more persuasively. But, because stockholders who bought in before the record date would have purchased their shares below the Merger price, they stood to profit if an achievable strategy or alternative promising more value than $25.60 were available and Cappello knew that they would vote their self interest if they believed that was the case.

Of course, certainty has real economic value, as the plaintiff must admit. One reason why premium bids are so compelling is that they deliver certain value right now, and therefore look attractive in comparison to promises that going alone will generate an even higher value in two or three years time, especially given the execution risk that attends such promises. It may have been for that very reason that Mihaylo thought that the Inter–Tel board would sign up a merger with him in the $22 to $23 a share range in 2006.

But the change in the record date did not unfairly tilt the odds against Mihaylo or any other Inter–Tel stockholder opposing the Merger. They remained free to convince their fellow stockholders that they would be better off economically if Inter–Tel rejected the Mitel bid and remained independent. If they made a convincing case that they were correct about where the most dollars could be had, they stood to prevail. In being inclined in this direction, I note that the plaintiff has failed to show that the agency problems resulting from the "separation of ownership from ownership"—i.e., from the fact that institutional investors have agency problems of their own because their interests are not identical to their investors'— are so substantial that stockholders will accept a merger at $25.60 per share when

they stand to make more profit on a risk—and inflation—adjusted basis by rejecting it.

As important, the Special Committee has persuaded me, on this preliminary injunction record, that the change in the record date was not what determined the outcome of the ultimate Merger vote. What determined the outcome was that ISS and Inter–Tel stockholders who held on both record dates came to view the Mitel Merger as the value-maximizing option. That change in behavior also negates the plaintiff's view that the circumstances that the Special Committee considered to have been consequential on June 29 in delaying the meeting were trifles. Taken together, the fuller information the stockholders had regarding Inter–Tel's operating performance and prospects, the state of the debt markets, and the credibility and value of Mihaylo's Recap Proposal was obviously influential. On August 2, the Inter–Tel stockholders had a much clearer understanding that their choice was down to taking the $25.60 per share Mitel bid or remaining stockholders in an independent Inter–Tel. No higher valued offer was coming from Mitel, Mihaylo, or another source.

The remaining factors to be analyzed can be addressed summarily. The Special Committee's acts did not preclude the Inter–Tel stockholders from freely choosing to reject the Merger. All a stockholder who held stock on both record dates had to do to register an objection to the Merger was to stick to her guns. Indeed, in this context, a stockholder who simply failed to return a proxy would effectively cast a no vote. Being required to wait a month or so before making a final decision hardly subjects stockholders to a loss of free will. Prior cases support this conclusion.[83]

Likewise, the Special Committee did not coerce the Inter–Tel stockholders. The short delay and new record date did not force Inter–Tel stockholders to change their vote. The sophisticated investors and proxy advisory firms involved in assessing the Mitel Merger's merits faced no sanction if they continued to view that Merger negatively, and there is no evidence that the Special Committee made threats of any kind.

Admittedly, the plaintiff does distrust the Special Committee's assessment of Inter–Tel's future prospects. But on this record, there is no basis for me to conclude that the Special Committee's reporting of Inter–Tel's second quarter results or management's revision of the company's projections was intentionally misleading or that the management revisions were not honestly made. Notably, as the plaintiff points out, the changes were not seismic in nature. A good faith decision to give the market more current and reliable information about the company's future prospects is not coercive; to the contrary, such a decision would seem to give the stockholders information that is useful to them in voting. Moreover, Mihaylo was well positioned to, and did, take issue with the Special Committee's assessment and the Special Committee faced a skeptical electorate unlikely to give unthinking weight to its views. By this time, Inter–Tel's stockholders and the proxy advisory services were skeptical of both the Special Committee and Mihaylo and therefore viewed Inter–Tel's revised projections through that lens. After considering the Special Committee's and Mihaylo's posi-

---

**83.** *E.g. H.F. Ahmanson & Co. v. Great W. Fin. Corp.*, 1997 WL 305824, at *16 (Del.Ch. June 3, 1997) (finding that a seven week delay of an annual meeting by a board facing a proxy contest would not prevent the effective exercise of the stockholders' franchise and thus *Blasius* did not apply).

tions, the overwhelming majority of Inter-Tel's stockholders concluded that the Special Committee had the better of the arguments, especially given Mihaylo's failure to come forward with a firm bid.

As to the question of coercion, the plaintiff have raised an argument based on that tritest of legal phrases—ye olde "slippery slope." If the Inter-Tel board could do this, why can't all boards simply convert the merger approval process into an Ironman triathalon, wearing the stockholders down until their loss of bodily function is so substantial that they relent simply to avoid further pain?[84] The answer to that, of course, is that the powers of equity can police manipulative behavior of that kind if it transpires.

But the situation here does not involve a board asking stockholders to survive a grueling gauntlet. The Special Committee's rescheduled date for the Merger vote was not unreasonably far into the future. And the Special Committee told the stockholders that an annual meeting would be held on September 12 if the Merger vote failed. Thus, stockholders who wanted to change corporate direction and toss out the incumbent majority could do so before the seasons even changed. Certainly, in the rough and ready United States of America, our corporate law can expect investors to be able to display fortitude by hewing to their convictions for ninety days or so.

Before concluding my determination of the main merits claim, I must deal with the question of whether a "compelling justification" supports the action of the Inter-Tel Special Committee. For the reasons I have stated, I believe that this test should be replaced by something more tempered, such as a "legitimate objective" test, so long as there is a recognition that the odd doctrine of "substantive coercion" has no proper place in jurisprudence regarding director elections. But I recognize that *Liquid Audio* and other cases seem to give continuing life to the compelling justification usage.

In this case, that standard can be addressed in two ways. The more traditional, but less convincing way, is to reason backwards out of that standard from the effect of the Special Committee's action. In prior decisions, this court has decided that because board action influencing the election process did not have the effect of precluding or coercing stockholder choice, that action was not taken for the primary purpose of disenfranchising stockholders.[85] Because non-preclusive, non-coercive action did not have the primary purpose of disenfranchisement, the *Blasius* standard did not apply and thus no compelling justification for the board's action had to be shown. That is, the lack of disenfranchising effect provided that the trigger for the test was not pulled.

That type of reasoning backwards from effect works here, of course. The primary purpose of the Inter-Tel board was not to disenfranchise its stockholders. Rather, it

---

84. In *Stahl,* the court did distinguish its scenario—involving delay of an expected, but not yet scheduled annual meeting—from one where the proxies were in but not yet formally counted. 579 A.2d at 1123. But that example highlights another important difference between director elections and merger votes. In the merger vote context, inertia works against the success of the merger. In a contested election of directors under a plurality vote standard, the continuation of a campaign by the board forces the other side to keep actively soliciting because a just say no strategy is not feasible. That could give the incumbents using corporate funds an unfair advantage depending on the circumstances. No such exhaustion inequity is extant here.

85. *See Chesapeake,* 771 A.2d at 323 n. 58 (collecting cases of this kind).

was to give the stockholders more time to deliberate before exercising their right to vote.[86] Because the Special Committee did not preclude stockholders from making a free and uncoerced choice about the Merger, its decision to reschedule the meeting does not invoke *Blasius* at all.[87]

■ Approaching the issue more directly, I conclude that the Special Committee has demonstrated a compelling justification for its action, even if that standard applies. In the corporate context, compelling circumstances are presented when independent directors believe that: (1) stockholders are about to reject a third-party merger proposal that the independent directors believe is in their best interests; (2) information useful to the stockholders' decision-making process has not been considered adequately or not yet been publicly disclosed; and (3) if the stockholders vote no, the acquiror will walk away without making a higher bid and that the opportunity to receive the bid will be irretrievably lost. Stockholders invest to make moolah, cash, ching, green, scratch, cabbage, benjamins—to obtain that which Americans have more words for than Eskimos have for snow—money. When directors act for the purpose of preserving what the directors believe in good faith to be a value-maximizing offer, they act for a compelling reason in the corporate context. Of course, that does not mean that they have unlimited freedom to advance that purpose. But that is a question about the fit between the means they employ, not the end they are seeking to achieve. Here, the means the Special Committee chose—a short delay in the meeting schedule and a new record date— were, as I have found, reasonable in rela-

tion to their objective. For all these reasons, I conclude that the plaintiff does not have a reasonable probability of success on its claim that the Special Committee breached its fiduciary duties by rescheduling the special meeting and setting a new record date.

## C.

■ I will next briefly address the plaintiff's argument that the Special Committee breached its fiduciary duty by failing to disclose more completely its motivation for rescheduling the meeting. That argument rests on two major points. First, the plaintiff says that the stockholders should have been told what the likely vote was going to be at the time the meeting was rescheduled. Second, the plaintiff says that the Special Committee did not disclose that one factor in setting a new record was that it would enable arbitrageurs to make additional purchases of shares that could be voted at the special meeting.

These arguments raise a difficult question about the candor expected of directors. Certainly, the Special Committee would have been more forthright had they stated in both these respects on June 29 the following: "If the vote were held today, the Merger would be defeated and Mitel would likely walk away. We believe that would be financially harmful to our stockholders and we want more time for them to consider the implications of their vote. In addition, we intend to set a new record date that is prospective in nature. This will enable more of our actual owners to vote on the Merger and enable new investors who buy shares before that and

---

86. *See, e.g., MONY, 853* A.2d at 676 (explaining that postponing a merger vote and setting a new record date "can provide for a vote that is ... fuller and fairer, in that more

stockholders having a direct interest in the outcome of the vote are likely to vote")

87. *Stahl,* 579 A.2d at 1122–23.

believe that the Merger is attractive in light of the company's future prospects to vote." And, as the plaintiff points out, our law expects directors who detail the reasons for their actions, to do so in a manner that is not materially misleading or incomplete.[88]

Although I am troubled by the coy nature of the press release rescheduling the meeting, I am not persuaded that the plaintiff has demonstrated a reasonable probability of success as to a claim that the Special Committee failed to disclose material facts reasonable to an Inter–Tel stockholder voting on the Merger at the rescheduled meeting. However the vote was running as of the time on June 29 when the meeting was rescheduled, the key question at the rescheduled meeting had to do with the merits of the Merger, not the prior tally. More fundamentally, the Special Committee's very decision to reschedule the meeting on June 29, while continuing to recommend the Merger to the stockholders, signaled that the Merger would not have been approved that day. The plaintiff himself admitted that that was the case. Certainly, Mihaylo knew it to be so and publicly said it was so. Doubtless ISS and their clients realized it. No secret was kept.

Likewise, the objective reality that arbs and hedge funds could buy stock and vote it because of the change in the record date was obvious to any reasonable investor, because the reality that such investors buy up shares in contexts like this is by now mundane. In fact, Mihaylo seized on this at the June 30 board meeting, charging the Special Committee with allowing "hot money" into the stock.[89] I find it difficult to accept that a reasonable stockholder would find it material in voting on the Merger to

know that Innisfree had advised the Special Committee that a new record date would facilitate voting by arbs. That fact would have little to do with the primary question—the economic merits of the Merger—and would be of even less relevance given that stockholders already certainly know that the Special Committee favored the Merger, had rescheduled the meeting to have more time to get support, and had moved the record date in a way that clearly enabled investors to move into the stock and obtain shares that could be voted in the meeting.

In sum, both of these disclosure points involve the kind of subsidiary matters that are probably best addressed in the to-and-fro of the contestants in the proxy contest, rather than through mandated judicial disclosure. Mihaylo was well-positioned to, and in fact made, arguments about these points in opposing the Merger. On this provisional record, I do not find it likely that the information the plaintiff contends should have been disclosed was material to the Merger vote. Thus, I do not believe that the plaintiff has met its burden on the merits. For the same reason, I also believe that it would be improvident to enjoin the closing of the Merger until this information is disclosed. To risk non-consummation of the deal by issuing an injunction until the disclosure of information that is both, in my judgment, irrelevant to the economic merits of the Merger and widely known would be imprudent.

### D.

Because the plaintiff has not met its burden to show a reasonable probability of success on the merits, his motion for a preliminary injunction must be denied. Candidly, even if he had met his merits

**88.** *E.g., Malone v. Brincat,* 722 A.2d 5, 12 (Del.1998).

**89.** PX 139.

burden, I would not issue a preliminary injunction against the Merger. On this record, I have no reason to believe that the stockholder vote on August 2 did not reflect the uncoerced, fully-informed judgment of the Inter–Tel stockholders about the Merger's economic merits. The record is clear that aside from Mihaylo, nine out of ten Inter–Tel stockholders who voted cast a positive vote. The record is also clear that the reason that the outcome was favorable is that stockholders who owned shares on both the original and ultimate record date changed their view on the merits of the Merger.

The realities of the expedited preliminary injunction process obviously create a risk that the Special Committee was in fact poorly motivated, engaged in undetected misbehavior, and that facts will emerge later that demonstrate that the Merger price was unfair. But, when a stockholder base comprised of sophisticated and skeptical investors decides to support a Merger opposed by a company's founder after a vigorous proxy contest and after other bidders have had an opportunity to, but did not, present a topping bid, a court would be reckless to give no weight to the majority's sentiments.[90] Here, to issue an injunction would give imprudently more weight to the interests of the plaintiff, a representative of a certified class, than to the expressed views of a majority of the class itself. Those who voted no can seek appraisal or pursue other equitable claims designed to achieve a monetary judgment providing them with higher value than $25.60 per share. If Mihaylo and the plaintiff both press for appraisal, as well as pressing equitable claims, the appraisal class would start at a formidable size (19% plus 100 of the shares) and other dissenters would have the chance to join them. Notably, the plaintiff is already certified as a class representative and can attempt to seek damages for the class based on breach of fiduciary duty theories. Because the dissenters can protect themselves in these ways, the balance of the harms tilts heavily against an injunction subjecting the voting majority to a risk they did not choose.[91]

IV.

The plaintiff's motion for a preliminary injunction against the closing of the Merger is denied. IT IS SO ORDERED.

---

**90.** The plaintiff has offered up only a nominal bond. His position is that it is irrelevant that he is unable to put up a bond that would protect the Inter–Tel stockholders if the Merger goes away, the injunction is later found to have been improvident, and the company's stock price plummets. Although I need not and do not reach the question of whether the plaintiff was bound to tender a bond to cover this eventuality—he argues that he was not because harm to the stockholders from the loss of a premium bid is not something he believes a bond is designed to cover in this circumstance—it is certainly relevant to a judge deciding whether to issue an injunction that the plaintiff offers no protection to other investors if the powerful remedy he seeks was wrongly granted and caused them harm. That the plaintiff owns only 100 shares is also relevant, as the insubstantiality of his stake renders him poorly positioned to subject investors with far more at stake to substantial risk.

**91.** *See In re Netsmart Technologies, Inc. S'holders Litig.,* 924 A.2d 171, 210 (Del.Ch. 2007); *Louisiana Mun. Police Employees' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1192 (Del. Ch.2007).