**Joe JOHNSTON, Dietmar Rose, and Doug Holt, Plaintiffs,**

v.

**Ken PEDERSEN, Robert Clifford, Jay McGarrigle, Richard Rygg, Jack Fish, and Xurex, Inc., Defendants.**

C.A. No. 6567–VCL.

Court of Chancery of Delaware.

Submitted: Sept. 7, 2011.

Decided: Sept. 23, 2011.

Brock E. Czeschin, Robert L. Burns, Richards, Layton & Finger, P.A., Wilmington, Delaware; Joseph W. Medved, Kimberly A. Wingate, Lathrop & Gage LLP, Kansas City, Missouri; Attorneys for Plaintiffs.

Stephen B. Brauerman, Justin R. Alberto, Vanessa R. Tiradentes, Bayard, P.A., Wilmington, Delaware; Attorneys for Defendants.

### OPINION

LASTER, Vice Chancellor.

In this action brought pursuant to 8 *Del. C.* § 225, the plaintiffs seek a determination that certain written consents validly removed the defendant directors and replaced them with a new slate. The defendant directors contend that they could not be removed or a new slate elected without the consent of a majority of the Series B Preferred Stock. Applying enhanced scrutiny, I hold that the defendant directors breached their fiduciary duties when issuing the Series B Preferred Stock. Although they honestly believed they were acting in the best interests of the company, they breached their duty of loyalty by structuring the stock issuance to prevent an insurgent group from waging a successful proxy contest. The class vote provision therefore cannot be given effect, and the written consents validly elected a new board.

## I. FACTUAL BACKGROUND

These are the facts as found after a two-day trial.

### A. Xurex

Xurex is an early-stage company engaged in the development and sale of protective coatings derived from nano-technology invented by Bo Gimvang. Since its founding in March 2005, Xurex has struggled to commercialize Gimvang's technology. Xurex's coatings historically perform well in laboratory tests, but vaporize when exposed to hostile real-world environmental factors like sunlight and air. As Xurex reported in a 2011 letter to stockholders, "[a]ctual field test[s] of [Xurex] products were pretty much all failures." JX 159 at 3.

Only one company has been able to develop a functional product from Xurex's technology: DuraSeal Pipe Coatings Company ("DuraSeal"), headed by plaintiff Joe Johnston. After Johnston's investor group lost approximately $500,000 in a disastrous attempt to sell Xurex coatings intended for residential use, Johnston set out to identify airless and sunlight-free environments where Xurex's volatile technology might succeed. It took approximately $600,000 and countless hours of research and testing, but Johnston and his team eventually discovered a unique method of using Xurex coatings to prevent corrosion, reduce abrasion, and extend the life of downhole pumps and pipes in the oil and gas industry. Johnston formed DuraSeal to pursue this business. In October 2008, DuraSeal and Xurex entered into a letter agreement authorizing DuraSeal to distribute Xurex's HabraCoat–SA and PenetrAct–SA products.

In the ensuing three years, DuraSeal has grown its business steadily, and DuraSeal now potentially sits on the cusp of a major expansion. Unfortunately for Xurex, DuraSeal's success has been unique. Xurex has never developed a commercial product of its own, and no other distributor has been able to pene-

trate a commercial market. Today, Dura-Seal remains Xurex's only customer and is responsible for 99% of Xurex's sales. The company's only non-DuraSeal revenue recently came from one drum of product sold for $20,000 to a distributor who wanted to research potential applications in the concrete industry.

## B. A Winter Of Investor Discontent

After founding Xurex, Gimvang and an early CEO named Bob Bishop raised $10 million dollars from outside investors based on private placement memoranda that made expansive claims about Xurex's technology and prospects. As a result of these private placements, prior to the issuance of the Series B Preferred challenged in this action, Xurex had outstanding 32,-046,313 shares of common stock and 15,-069,850 shares of Series A Preferred Stock. The Series A Preferred carried one vote per share and voted with the common stock on an as-converted basis. Gimvang and Bishop together controlled a majority of the company's outstanding voting power.

Many of the investors who purchased the common stock and Series A Preferred were sophisticated backers of early-stage companies who expected "much better than average returns." JX 12 at 1. Instead, they watched Bishop and Gimvang burn through their capital by spending $1.7 million on manufacturing equipment that Xurex has never used, entering into a long-term lease for an industrial facility outside of Albuquerque that Xurex only partially occupies as its headquarters, and approving large salaries and expense reimbursements for themselves and other members of management.

In 2009, Bishop and Gimvang faced a rising tide of stockholder discontent. They hired Rex Powers, an executive recruiter, who identified Bill Loven as a

candidate for CEO. Bishop stepped down in favor of Loven. Soon after taking office, Loven began to investigate allegations that Gimvang and Bishop defrauded investors and misused company funds. After finding evidence to support the allegations, Loven pursued them vigorously.

Thus began a tumultuous season that witnessed three successive control contests. Gimvang and Bishop promptly reminded Loven that they controlled a majority of Xurex's outstanding voting power. They gave proxies for their shares to Powers, who used the proxies to remove Loven and the rest of the Xurex board. In their place, Powers elected himself and defendant Robert Clifford. In October 2009, Powers added defendant Ken Pedersen as an additional director.

At the time, Xurex faced a financial crisis. It had perhaps $9,000 in the bank and was burdened by the long-term lease on its largely unused Albuquerque facility. To stabilize the company, Powers, Pedersen, and Clifford offered DuraSeal a new licensing deal. In an agreement ultimately executed on January 13, 2010, DuraSeal received exclusive rights to market and sell all Xurex products (past, present, and future) to the North American oil and gas industry until October 1, 2018. In return, DuraSeal paid an up-front license fee of $200,000, made initial purchases of Xurex product totaling $100,000, and agreed to pay a monthly royalty calculated as a percentage of its revenues from Xurex products. DuraSeal also committed to minimum purchase requirements.

In December 2009, however, the licensing agreement was still in the works. At a meeting of stockholders held that month, Powers, Pedersen, and Clifford could do little more than present plans for addressing Xurex's problems. Approximately 50–60 stockholders attended and vented their frustrations with the company. During

the meeting, the board creatively offered to hold an election of directors by written ballot. Any stockholder would be permitted to nominate candidates, the company would prepare and distribute mail-in ballots, and the deadline for submitting votes would be February 5, 2010.

On January 11, 2010, the board distributed to stockholders the procedures for the mail-in election. On January 12, an investor named Richard Fox arrived at Xurex's headquarters with proxies purportedly representing a majority of Xurex's outstanding voting power. The critical proxy came from Gimvang, who alone controlled 43.5% of the company's voting power through his ownership of common stock. Gimvang had revoked the proxy he previously granted to Powers, and the defendants suspect that Bishop orchestrated the insurgency after the Xurex board determined that he misused company funds. Clifford reviewed the proxies, concluded that they represented at most 49% of the company's voting power, and accepted only 48% as valid. Clifford also informed Gimvang about the long-term license deal with DuraSeal. Gimvang withdrew his support from Fox, and Fox graciously exited the Xurex scene.

The deadline for the mail-in election was February 5, 2010. On January 25, Powers, Pedersen, and Clifford sent a letter to stockholders announcing the long-term license agreement and summarizing the company's historic struggles. The directors noted that the funds from the license agreement would "help keep us going until a combination of new investment and margin from greatly expanded sales stabilize our finances, and put us in a position to really capitalize on the technology." JX 12 at 2.

When the mail-in ballots were counted, Powers, Pedersen, Clifford, defendant Jay McGarrigle, and plaintiff Dietmar Rose had received the most votes. After company counsel expressed understandable concern about the validity of the mail-in election mechanism, the existing directors (Powers, Pedersen, and Clifford) added McGarrigle and Rose to the board by filling vacancies. Disagreements soon arose between Powers and Rose, and Rose resigned. The remaining directors filled the ensuing vacancy with Richard Rygg, who had received the next highest number of mail-in votes.

## C. The Board Seeks "Stability."

To understand what the directors did next, picture the view from the boardroom after the write-in election. The licensing agreement had stabilized Xurex's immediate financial position, but the company still lacked a commercial product of its own. It depended on DuraSeal for 99% of its revenue and was burdened by legacy obligations such as the long-term lease. Xurex might have gained breathing room, but soon it would need money again.

Especially for Powers, Pedersen, and Clifford, the prospect of another election contest loomed like the sword of Damocles. Gimvang and Bishop still controlled a majority of the company's voting power, and although Powers held a proxy from Bishop that was valid until September 22, 2010, Gimvang revoked a similar proxy when he decided to support Fox. Gimvang had proven particularly fickle in his support. First he backed the Powers group, then months later switched to Fox, then weeks later switched back again to the Powers group. The directors believed that Gimvang faced a major tax audit, needed money, and could be easily swayed. The directors also intended to pursue (and later filed) litigation against Bishop to recover misappropriated funds. Powers, Pedersen, and Clifford owed their positions as directors to Bishop's and Gimvang's re-

sponse to Loven's investigation. Having concluded that Loven was right, they understandably expected Bishop and Gimvang to attempt another coup.

For their parts, Pedersen and Clifford benefitted materially from their roles at the company. Pedersen began his career as an accountant at Ernst & Whitney and then enjoyed a two-year stint as CFO of Capitol Records. Later, Pedersen was on the acquisition team at EMI when it acquired Virgin Records, where he was an executive vice president until 2003. Since then, Pedersen has tried his hand at several ventures, most recently his own music company. He testified at trial about experiencing personal liquidity issues, and said that his $120,000 annual salary as Xurex's CEO was material to him. Clifford has been a friend of Powers since high school. He received an MBA from the Wharton School and held positions with Xerox, Intel, Motorola, and Sun Microsystems. More recently, Clifford worked at an on-line recruiting company and for a seller of training videos for factory workers. Both companies failed. Clifford currently is self-employed selling vitamins over the internet. Clifford testified that his $100,000 annual salary as Xurex's corporate secretary represents about 80% of his annual income.

The principal figures at Xurex therefore had ample reason not to want another control contest. In March 2010, they set out to kill two birds with one stone. By raising capital through a new equity issuance, they would provide the company with additional reserves and dilute the Bishop/Gimvang block. On March 4, the board formally authorized Pedersen to pursue "a bridge loan convertible into stock at the next private placement financing." JX 13 at 2. As originally envisioned, the bridge loan would be

for $300,000, with a 10% per annum interest rate payable quarterly, with a 9 month term, a $25,000 minimum participation, and [secured by] the new, unused bottling line equipment ... located at the Company's plant in Albuquerque.... The loan amounts still outstanding at the time of any future stock offering are to be convertible into shares of the offering at a 50% discount to the offering price which is planned to be based on the valuation appraisals that are being performed. No Xurex Inc. Directors are not [sic] to participate in the financing unless investor participation falls short of $300,000. Investors may over-subscribe up to a maximum of total financing of $500,000. Other terms and limitations are at Ken Pedersen's discretion.

*Id.* The board also formally authorized a lawsuit against Bishop. *Id.* at 3.

Having considered the evidence at trial, I find that when Pedersen, Clifford, and the other directors approved the bridge loan, they sought both to raise capital and to limit the ability of Bishop and Gimvang to replace them. The directors originally did not anticipate that the subsequent equity issuance would carry a class voting right. That concept emerged later. At the outset, they rather expected that the issuance would dilute Bishop and Gimvang sufficiently to deprive them of hard control and give the incumbents a fighting chance at winning a future proxy contest. They pursued this goal in the belief that Xurex would benefit from a period of "stability," a term that each defense witness embraced. What the directors actually meant by "stability" was to prevent themselves from being removed from office, making "stability" a euphemism for entrenchment. But the euphemism was not wholly inapt, because although the directors literally sought to entrench themselves, they did not do so selfishly. They subjectively be-

lieved in good faith that preventing another control dispute would best serve the interests of Xurex and all of its stockholders. In reaching this conclusion, I have taken into account that Pedersen and Clifford led the process, that they benefitted materially from their management positions at Xurex, and that they both hoped to break out of mid-career slumps with a nano-coated home run. Although their individual perspectives inevitably influenced their perceptions, I find that Pedersen and Clifford subjectively believed that a personally beneficial course of action optimally served the company and its stockholders.

## D. The Bridge Loan

On April 16, 2010, the Xurex board notified all stockholders of the opportunity to participate in the bridge loan. As described in the cover email,

> [t]he secured Bridge Loan is a Convertible Promissory Note for short term financing designed to inject $300,000 into the company. The loan will be sufficient to support operations, continue the patent filing process and move forward with our testing and validation protocols until the company can complete a Private Placement Memorandum (PPM) sale of Series B Preferred Stock. The Bridge Loan will be convertible into this Series B Preferred Stock. The price for Series B Preferred Stock will be dependent on the independent valuations currently being performed to establish a current value for Xurex. . . .
>
> The Series B Preferred Stock offering is scheduled for late May or early June. The Bridge Loan may be converted at a 50% discount to the Series B Preferred offering price per share.

JX 17 at 1. The materials noted that the directors would not participate unless the company failed to receive initial commitments of at least $300,000. Neither the email nor the supporting documents described the terms of the Series B Stock or mentioned any voting rights.

The board imposed rapid response dates for participation in the offering. The materials were sent on Friday, April 16, 2010. The offering began on Monday, April 19. The deadline for receiving $300,000 in commitments was Friday, April 23. Within this timeframe, investors ostensibly were expected to decide whether or not to invest in a bridge loan convertible into an undefined preferred security. Not surprisingly, Xurex did not receive $300,000 in financing commitments by April 23. The offering then opened for the directors, and McGarrigle and Rygg each committed $50,000.

At trial, the defense witnesses failed to offer a convincing explanation for the short response dates. I find that they were intended to help ensure that the bulk of the bridge loan ended up in friendly hands, both by facilitating director participation and by making it more likely that investors would not participate unless personally solicited.

## E. The Germ Of The Class Vote

In connection with the bridge loan, Pedersen went through the Xurex stockholder list and called each of the relatively large Xurex stockholders whom he thought might participate. During these calls, the concept of the class vote began to take shape.

Several of the large stockholders told Pedersen that they would consider investing in the bridge loan on the basis of Pedersen's personal credibility and plans, but they needed to have confidence that Pedersen would stay with the company. Like the board, these investors feared another effort by Bishop and Gimvang to take control. One key stockholder, Brad

Duncan, spoke for a number of individuals whom he initially brought to the company and who invested regularly with him. Duncan memorialized his concerns in an email:

> The head of the snake (Bishop) has not been cut off ... This is mandatory, as he long [sic] he is alive & can slither around ... he is a detriment to the monies (I'm already in for $225K & my wife in for $5K) any & all of us have at stake with this investment as it stands.

JX 22.

Pedersen promised Duncan and other investors that he would find a way to achieve stability and address their concerns. As Pedersen's thinking evolved, he told certain investors that the preferred stock would include some kind of "super vote right" to protect against an unwanted change of control from the then-current board. *See, e.g.,* Defs.' Pre–Trial Answering Br. at 16 (summarizing evidence by explaining that the defendants told certain investors "that the Series B would likely contain some sort of protection, like a "super vote right" that would address their concerns"). Pedersen selectively disclosed this information to the stockholders he believed were likely to invest. *See* JX 23 (Clifford noting that Pedersen "thought he had [the bridge loan] already sold just with the people he had talked with"). The directors never made similar disclosures to other stockholders.

On May 25, 2010, Xurex extended the bridge loan offering until May 31 and disclosed that the offering had been opened to directors. The ready extension to May 31 supports the inference that the short original deadlines were tactically inspired. The amended materials did not describe the terms of the preferred stock or mention any voting rights or other features designed to provide stability, even though this concern was front and center for the board. To that end, Powers and Pedersen simultaneously were exploring whether an investor group led by Rygg and McGarrigle could structure a deal with Gimvang to purchase some or all of his shares and obtain an irrevocable proxy until all the stock was purchased. *See* JX 20; *see also* JX 37 (Clifford, Powers, and Pedersen discussing in July 2010 how Gimvang's shares could be used by an insurgent to create a majority).

On June 1, 2010, Duncan agreed to invest. That same day, Xurex informed stockholders that the deadline for bridge loan commitments was being extended again to June 3, that the deadline for receiving signed paperwork was now June 11, and that the deadline for receiving funds was now June 16. This move facilitated Duncan's friendly investment. The board subsequently waived other deadlines for favored investors. Defendant Rygg funded his bridge loan investment on July 19, 2010, over a month after the deadline. William Evans submitted his payment and paperwork on September 9, 2010, over two months after the deadline. He was part of the investor group led by Duncan, who supported the incumbent board.

## F. The Series B Preferred

Sometime in July 2010, Pedersen and Clifford held a brainstorming session with counsel to decide how to structure the Series B Preferred. The group decided to implement the "super vote right" that Pedersen had discussed with selected investors.

On August 24, 2010, the Xurex board exercised its authority under the blank check provision of the Xurex certificate of incorporation to authorize the issuance of up to 20 million shares of Series B Preferred. Like the Series A Preferred, the Series B Preferred carries one vote per share and votes with the common stock on

an as-converted basis. Unlike the Series A Preferred, it carries the following additional class voting right:

> In addition to the [voting rights] in Section 4(a) hereof, so long as the shares of Series B Preferred remain outstanding, the affirmative vote or written consent of the holders of a majority of the outstanding shares of Series B Preferred, voting separately as a single class, shall be required for the approval of any matter that is subject to a vote of the Corporation's stockholders, whether or not a class vote is required by law.

JX 41 at 3. This provision received scant, if any, attention during Xurex board meetings. Clifford did not recall discussing it with any board members other than Pedersen. He thought it was discussed only briefly, if at all. McGarrigle did not recall the provision being discussed at any Xurex board meeting.

On August 25, 2010, the board approved and circulated to the company's stockholders a private placement memorandum ("PPM") that offered up to 8,253,359 shares of Series B Preferred for purchase at $0.1042 per share. The PPM established a maximum investment per stockholder of $50,000. This cap limited the extent to which stockholders who had not participated in the bridge loan could acquire a substantial position in the Series B Preferred.

At trial and throughout this litigation, the defendants asserted that the class voting provision was necessary to induce investors to purchase the Series B Preferred. Yet the PPM mentions the provision only once, on page 29 of the 34 page document. The entire discussion appears below:

> **Voting.** Holders of the Series B Preferred Stock will also vote together with holders of any other series of preferred stock of the Company (on an as-convert-

ed to common stock basis) and Common Stock as a single class, all such holders entitled to cast one vote per share. The affirmative vote or written consent of the holders of a majority of the outstanding shares of Series B Preferred, voting separately as a single class, shall be required for the approval of any matter that is subject to a vote of the Corporation's stockholders, whether or not a class vote is required by law.

JX 45. Despite describing as one of the company's "Risk Factors" that Gimvang and Bishop together controlled over 50% of the voting power, the PPM did not discuss the implications of the class voting right. The provision was not mentioned in either the "Summary of Offering" section or in the cover email, which described the Series B Preferred's liquidation preference, dividend rights, and convertibility feature. The apparent tension between the avowed necessity of the class vote provision and the lack of disclosure can be easily resolved: the directors needed to provide the class vote to induce favored (*viz.* incumbent-supporting) stockholders to invest. There was no need to call this attractive feature to the attention of other non-favored and potentially non-incumbent-supporting investors.

The Series B Preferred offering closed on September 10, 2010. It raised approximately $443,152. Of that amount, $269,597 came from converted principal and interest from the bridge loan.

The board's chosen structure for issuing the Series B Preferred resulted in a small group of stockholders controlling the class vote feature. At trial, the defendants proved that Pedersen, Clifford, and McGarrigle do not have close personal or professional relationships with most of the Series B holders and cannot expect to dictate how the shares are voted. That, however, was never the board's goal.

Rather, the evidence establishes clearly and convincingly that the defendants successfully placed the Series B Preferred with friendly stockholders who are either (i) members of the board, (ii) family or friends of board members, or (iii) belong to investor groups led by individuals like Duncan who support incumbent management.[1] The board knew that they could count on these investors to support the existing directors, perhaps not indefinitely, but at least for the foreseeable future. Indeed, the primary purpose of the "super vote right" that Pedersen promised to certain bridge loan investors was to promote "stability" at Xurex by blocking attempts to remove the incumbent board.

### G. The Di Mase Group Acquires Dura-Seal.

Ironically, the threat to the incumbent board did not come directly from Gimvang or Bishop, but rather from an unexpected quarter. In mid–2010, Tristam Jensvold became interested in DuraSeal and its attractive prospects for exponential growth within the oil and gas industry. Jensvold is the son-in-law of Jose Di Mase, a Venezuelan–Italian businessman with at least one successful privately held company to his credit and access to well-heeled, high net-worth partners.

Jensvold quickly reached the rather obvious conclusion that it made sense to combine DuraSeal and Xurex. DuraSeal's CEO, Johnston, shared this view. Recognizing that Gimvang's shares would prove critical in any control contest, Johnston negotiated an agreement to purchase 15 million shares of common stock from Gimvang for four cents a share, with the purchases to occur quarterly over a four-year period. In return Gimvang granted Johnston an irrevocable proxy to vote all of his 18.5 million shares, plus any shares that he acquired in the future.

While performing due diligence on DuraSeal, the Di Mase group's attorneys identified the class vote provision in the Series B Preferred and raised it with Johnston. This was not the first time that someone from DuraSeal focused on the provision. When the PPM went out in August 2010, Michael Burstein, then-Chairman of DuraSeal, received a copy. He spoke with Xurex Chairman Powers about the class vote provision, and Powers later expressed concern to the other Xurex directors. Johnston testified that at the time, he did not comprehend the implications of the class vote provision. This is true in a sense. I believe he did not anticipate that DuraSeal might soon want to acquire Xurex and be blocked by the class voting right.

In December 2010, Johnston called both Pedersen and Clifford about the class vote provision. He told them that DuraSeal now wanted to participate in the Series B offering and purchase $1 million of Series B Preferred. In response, the Xurex board took the position that the Series B offering had closed and offered to sell Johnston $1 million of common stock. They clearly understood that Johnston wanted to eliminate an obstacle to a proxy contest, and they had no desire to dismantle their Maginot Line. Johnston angrily declined to purchase common stock and told Pedersen and Clifford that he was "coming after you like a freight train." Tr. 424; *see* Tr. 91.

On December 31, 2010, the Di Mase group agreed to purchase all outstanding

---

1. Directors Rygg, McGarrigle, and Fish control 26% of the Series B Preferred. Fish's daughter and son-in-law control another 7%. Clifford's cousin controls approximately 1%. Duncan and his wife control another 9%, and members of his investor group control an additional 14%.

stock of DuraSeal and all Xurex stock held individually by Johnston and other DuraSeal investors. The transaction closed in January 2011. DuraSeal is now a wholly-owned subsidiary of DuraSeal Holdings, S.r.l.

Also on December 31, 2010, DuraSeal Holdings and Xurex entered into an Exclusive License, Marketing and Distribution Agreement that granted DuraSeal Holdings worldwide rights to market Xurex products in ceramic tile applications and the oil and gas, automotive, and aviation industries, except for the oil and gas industry within North America. DuraSeal Holdings agreed to pay an upfront licensing fee of $200,000, to purchase certain minimum amounts of Xurex products, and to pay a royalty equal to 5% of Xurex-related revenue.

## H. The DuraSeal Proxy Contest and Consent Solicitation

In April 2011, DuraSeal began soliciting proxies from Xurex stockholders to remove the incumbent Xurex directors and elect a new board. In May, the Xurex board learned of the solicitation and began a counter-solicitation. At the time, Xurex's annual meeting of stockholders was scheduled for June 25, 2011.

On June 14, 2011, the plaintiffs delivered written consents to Xurex's registered agent in Delaware and principal place of business in Albuquerque. The written consents purported to remove the defendants as Xurex directors, fix the number of directors on the board at five, and elect Johnston, Rose, Bill O'Brien, Nate Hutchings, and Carl McCutcheon as directors. McCutcheon subsequently declined to serve. The plaintiffs contend that O'Brien, Hutchings, and Rose are independent directors with no connections to DuraSeal or the Di Mase group.

Also on June 14, 2011, the plaintiffs initiated this action seeking an order pursuant to 8 *Del. C.* § 225 declaring that the written consents were valid and effective. Plaintiffs contend that the written consents represent approximately 69% of the outstanding common stock, 51% of the outstanding Series A Preferred Stock, and 13% of the outstanding Series B Preferred Stock. The defendants have since conceded that the consents represent a majority of Xurex's outstanding voting power and would be effective but for the class vote provision in the Series B Preferred.

## II. LEGAL ANALYSIS

During both discovery and trial, the plaintiffs attacked the defendants' record as stewards of the company, and the defendants responded in kind. It is not my place to evaluate the qualifications of the competing slates. For good or ill, Xurex's stockholders have the right to choose those individuals who, as members of the board, will direct and oversee the business and affairs of the corporation. Stockholders representing a majority of the company's outstanding voting power have endorsed the insurgent slate. My more limited task is to determine whether the written consents can be given effect without the affirmative vote of holders of a majority of the Series B Preferred. Because the defendant directors issued the Series B Preferred in breach of their duty of loyalty, I will not enforce the class vote provision.

## A. The Series B Preferred Under Enhanced Scrutiny

When a board of directors takes action that affects the stockholder franchise, the board must justify its action under the enhanced scrutiny test. *See Mercier v. Inter—Tel (Del.), Inc.,* 929 A.2d 786, 810–11 (Del.Ch.2007). Enhanced scrutiny is Delaware's intermediate stan-

dard of review. *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457, 2011 WL 4346913, at *8 (Del.Ch. Jan. 21, 2011). It applies "when the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors." *Id.*

 Directors facing a proxy contest face an inherent positional conflict: "A candidate for office, whether as an elected official or as a director of a corporation, is likely to prefer to be elected rather than defeated. He therefore has a personal interest in the outcome of the election even if the interest is not financial and he seeks to serve from the best of motives." *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1206 (Del.Ch.1987). "Enhanced scrutiny also applies in other situations where the law provides stockholders with a right to vote and the directors take action that intrudes on the space allotted for stockholder decision-making." *Reis*, 28 A.3d at 457, 2011 WL 4346913, at *8; *see State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *10–11 (Del.Ch. Dec.4, 2000) (applying enhanced scrutiny to meeting adjournment that kept polls open for vote on increasing shares allocated to stock option plan).

 When tailored for reviewing director action affecting a stockholder vote, enhanced scrutiny requires that the defendant fiduciaries bear the burden of persuading the Court that their motivations were proper and not selfish, that they did not preclude stockholders from exercising their right to vote or coerce them into voting in a particular way, and that the directors' actions were reasonably related to a legitimate objective. If the fit between means and end is not reasonable, then the directors fall short. *Mercier*, 929 A.2d at 810. When the vote involves an election of directors or touches on matters of corporate control, the directors must support their decisions with a compelling justification. *Id.* at 811. The shift from "reasonable" to "compelling" requires that the board establish a closer fit between means and end. Moreover, in such a context, there is one justification that the directors cannot invoke: they cannot claim that the stockholders may vote out of ignorance or mistaken belief about what course of action is in their own interests. *Id.; see* Leo E. Strine, Jr., *The Story of Blasius Industries v. Atlas Corp.*, *in Corporate Law Stories* 243, 290–91 (J. Mark Ramseyer ed., 2009) ("[W]hat was core to *Blasius* was that the judiciary not accept the doctrine of substantive coercion as a justification for director conduct affecting the election process."). The resulting test incorporates the principles that animated Chancellor Allen's decision in *Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch.1988), and applies them "*within* the … enhanced standard of judicial review." *MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129 (Del. 2003); *accord Stroud v. Grace*, 606 A.2d 75, 92 n. 3 (Del.1992).

 In this case, the record establishes that the defendant directors adopted the class vote provision in the Series B Preferred for the specific purpose of preventing holders of a majority of Xurex's common stock and Series A Preferred from electing a new board. The directors candidly admitted that they believed another control contest would be detrimental to the company, that it would be disastrous if Bishop returned to power, and that they wanted Pedersen and Clifford to have time to implement their business plan. To that end, the board initially set out to dilute Gimvang and Bishop's majority stake. I need not speculate on whether that course of action would be valid, because the directors' plans evolved in a more potent direction.

As a result of his discussions with supportive investors, Pedersen decided that the Series B Preferred should have some type of "super vote right" that would prevent a change of board control without the approval of the holders of the Series B Preferred. The board then implemented the "super vote right" in an expansive form that gave the Series B Preferred a veto over any action submitted to stockholders. The directors have attempted to justify this provision by claiming that Xurex needed capital and that key investors wanted assurance that Pedersen and the incumbent board would remain in charge. But the directors also admittedly wanted to preserve the incumbent board in place. Under the circumstances, the defendants failed to carry their burden of persuasion that the class vote provision was adopted in furtherance of a legitimate corporate objective. The incumbent directors could not act loyally and deprive the stockholders of their right to elect new directors, even though they believed in good faith that they knew what was best for the corporation. "The notion that directors know better than the stockholders about who should be on the board is no justification at all." *Mercier,* 929 A.2d at 811; *accord Blasius,* 564 A.2d at 663. The right to choose who should be members of the Xurex board did not belong to the Xurex directors; it belonged to the Xurex stockholders.

Assuming for the sake of discussion that the directors subjectively intended only to raise capital, in my view this goal is not a sufficiently compelling justification for issuing the Series B Preferred with a class vote on any issue that could be submitted to the corporation's stockholders. Pedersen admitted at trial that the class vote provision was broader than necessary to address investor concerns, and Clifford acknowledged that the provision went beyond what was needed for stability. The

bridge loan and Series B offering transferred negative control over Xurex to a handful of stockholders that included the defendant directors and holders whom they counted on for support. In return for negative control, the stockholders invested $443,152. In connection with the Series B offering and issuance, the board valued the company at approximately $3.2 million as of December 31, 2009. The board thus sold negative control for approximately 12.2% of its post-money valuation.

For similar reasons, the structure of the bridge loan solicitation and subsequent Series B offering was not sufficiently tailored to a capital-raising purpose. The initial bridge loan and each amendment were opened up to investors on a first-come, first-served basis, and the board requested responses on an extremely abbreviated time frame. These features, combined with the absence of detail about the terms of the contemplated Series B Preferred, made it likely that the only stockholders to invest would be those who possessed or quickly established a mutually supportive relationship with incumbent management. Pedersen only disclosed the highly material information about the "super vote right" to favored, management-supporting stockholders. Other stockholders were not provided with this critical information. The right to convert the bridge loan into Series B Preferred at a 50% discount in turn helped assure that the favored stockholders from the bridge loan would own a majority of the Series B Preferred. Participation in the Series B Preferred offering was otherwise capped at $50,000, which further reduced the likelihood that anyone other than bridge loan investors would obtain a majority of the Series B Preferred. Like the bridge loan, the Series B Preferred was offered on a first-come, first-served basis with short response deadlines. Accordingly, although

the bridge loan and Series B Preferred issuance were structured in a manner nominally open to all stockholders, in reality the offerings delivered control of the class vote into friendly hands. To the extent this was a collateral consequence of a capital raise, the price paid by stockholders in the coin of voting rights was too high.

█ The defendant directors therefore breached their duty of loyalty by issuing the Series B Preferred. Despite this fiduciary failing, they have convinced me that they acted in good faith. To reiterate, they honestly believed that a period of "stability" (*i.e.* entrenched incumbency) would be in the best interests of Xurex. "An inequitable purpose is not necessarily synonymous with a dishonest motive. Fiduciaries who are subjectively operating selflessly might be pursuing a purpose that a court will rule is inequitable." *Stahl v. Apple Bancorp, Inc.,* 579 A.2d 1115, 1121 (Del.Ch.1990); *see Blasius,* 564 A.2d at 663 (concluding that good faith conduct constituted an unintentional violation of the duty of loyalty).

## B. The Equitable Defenses

The defendants contend that the plaintiffs should be barred from challenging the validity of the class vote provision because of laches and unclean hands. Neither defense applies.

 The defendants' effort to invoke laches fails because they have not attempted to demonstrate any prejudice they suffered from the purported delay. "Unlike a statute of limitations, which inherently focuses on the passage of time, laches depends on more than a showing of delay. A 'party must also prove that he has suffered actual prejudice or injury as a result of the plaintiff's unreasonable delay.'" *Fike v. Ruger,* 754 A.2d 254, 262 n. 5 (Del.Ch.1999) (quoting Donald J. Wolfe,

Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.06[b][3] (2010)).

█ The defendants' unclean hands defense observes that when negotiating the purchase of Gimvang's shares, Johnston and Jensvold bargained for a lower price by pointing out to Gimvang that his shares no longer gave him as great a degree of control over Xurex in light of the class vote provision. Relatedly, the defendants argue that Johnston offered to purchase $1 million of Series B Preferred from the Company in December 2010. The defendants say that because Johnston and Jensvold took advantage of the Series B Preferred for their own benefit (or tried to) they cannot mount an equitable challenge. The factual underpinnings for these assertions were hotly disputed at trial. Whatever the merit of these arguments, I need not reach them because they do not apply to Rose or Holt, the other two plaintiffs in this action. Their participation as plaintiffs supports relief regardless of any defense against Johnston.

## III. REMEDY

Because the defendants adopted the class vote provision in breach of their duty of loyalty, the holders of the Series B Preferred are not entitled to a class vote in connection with the removal of the incumbent board and the election of a new slate by written consent. Any further remedy must await a plenary action. *See Genger v. TR Investors, LLC,* 26 A.3d 180, 199 (Del.2011) ("A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer."). The written consents submitted by plaintiffs and other Xurex stockholders were therefore effective to remove the defendant directors

from office and replace them with the new directors.

## IV. CONCLUSION

The duly elected Xurex board consists of Johnston, Rose, O'Brien, and Hutchings.

**IT IS SO ORDERED.**